THORP et al., appellants, *v.* FREED et al., respondents.

PRACTICE — *assignment of errors.* This court will not review errors which do not point out wherein the evidence is insufficient to support the findings of fact.

PRACTICE — *opinion — findings.* The opinion of the chancellor in an equitable action is not a finding of facts.

PRACTICE — *reasons for judgment.* A cause will not be reversed because the court rendered its judgment for erroneous reasons.

WATER — *appropriation for irrigation — riparian proprietors — laws of Territory and congress relating to water rights — local customs.* WADE, C. J., and KNOWLES, J., have discussed these questions in their opinions and arrived at different conclusions. MURPHY, J., could not act as a member of the court, and did not express any opinion at the time the case was examined. There is no opinion of the court and a syllabus of these opinions is omitted by the reporter.

*Appeal from the Third District, Lewis and Clarke County.*

THE court, WADE, J., rendered the decision in this case. The facts are stated in the opinions.

CHUMASERO & CHADWICK and E. W. TOOLE, for appellants.

Counsel filed an argument containing authorities on the questions on which there was no opinion of the court.

SHOBER & LOWRY, W. F. SANDERS and R. LAWRENCE, for respondents.

[The reporter has omitted that part of the argument relating to the water questions.]

There are no written findings in this case and none were demanded by appellants. Civ. Prac. Act, § 180 ; *Sanchez* v. *McMahon*, 35 Cal. 225.

No defects or specifications of errors are pointed out, as required by statute. *Hidden* v. *Jordan*, 28 Cal. 302 ; *Beans* v. *Emanuelli*, 36 id. 120.

Findings must be excepted to specially and exception must be saved in the court below. *Hurlburt* v. *Jones*, 25 Cal. 225 ; *Warner* v. *Holman*, 24 id. 228.

The opinion of the court below cannot be treated as a finding. 3 Estee's Pl. 432, and cases cited.

CHUMASERO & CHADWICK and E. W. TOOLE, for appellants, in reply.

This is an equity case, governed by the rules of the supreme court of the United States and chancery practice. It is unnecessary to specify errors, as when a case at law is appealed. 2 Abb. (U. S.) Prac. 228 ; 2 Dan. Ch. Prac. 1484; *Wiscart* v. *Dauchy*, 3 Dall. 321; *The San Pedro*, 2 Wheat. 132.

The civil practice act and California decisions under the same are not applicable to this case. This court must enter into a re-examination and rehearing of the entire case upon the record.

KNOWLES, J. This case, in some respects, is anomalous. The plaintiffs assert a right to the waters of Prickley Pear creek, as appropriators thereof for the purposes of irrigation, and complain that the defendants have diverted some of the waters of said creek, and prevented the same from flowing into plaintiffs' irrigating ditches, and ask for an injunction to prevent the continuance of this breach of their rights.

The question of the right, in this Territory, to appropriate water for the purposes of irrigation, is one of great importance and general interest, and which, perhaps, ought to be

determined at the earliest day possible. Undoubtedly, this cause might be decided, in view of the manner in which it is presented to this court, without considering this question; but, as it was presented in the trial, in the court below, and is ably discussed in the arguments of both appellants and respondents, we feel called upon to express our views concerning it.

The common-law rule was, that he who owned land upon the banks of a running stream, or land over which the same flowed, had a right to have the waters thereof flow down, to or over his land, undiminished, materially, in quantity or quality. The riparian proprietor could use the water flowing past or over his land for domestic purposes and to quench the thirst of man and animals; but no one was permitted to divert water from the channel where it was accustomed to run, for the purposes of irrigation. Certainly such a diversion of water would both diminish materially its quantity and quality. The first legislative assembly of Montana Territory enacted:

"That the common law of England, so far as the same is applicable and of a general nature, and not in conflict with the special enactments of this Territory, shall be the law and rule of decision, and shall be considered as of full force until repealed by legislative authority." Laws of Montana for 1864 and 1865, 356.

The only way that a court can escape the bearing of this statute on this subject would be to hold that the common law, upon the question of riparian proprietors, was either inapplicable or was not of a general nature, or was in conflict with some enactment of the legislative assembly of this Territory, or of the congress of the United States.

We have running streams, upon whose banks people live and hold land, and this would be sufficient to show its applicability. We do not conceive that a court can say that the provisions of the common law are not for the best interests of this section of country, and therefore inapplicable. The question of whether or not a law is for the good of the people in our Territory, is a matter for legislative, and not

judicial, consideration. Much of the common law of England pertains to the English form of government, and the privileges of castes, which are not at all applicable to our form of government; and these are the provisions of the common law, I presume, the legislative assembly had in view in the enactment above referred to as inapplicable. It seems to be contended, by the court below, that the natural wants of man, and the physical and climatic conditions of this Territory, have of necessity changed the common law upon the subject of riparian proprietors, or that these show that that law is inapplicable, in part at least. And it was held by the court below that, in accordance with the demands of our section, the common law was so modified that any one, living upon the banks of a running stream, as a riparian proprietor, can divert the waters thereof, for the purposes of irrigation, to the extent of the land he cultivates; and that he who is nearest to the source of the stream shall have, by virtue of his position, the right to first divert the waters of the same, to the exclusion of those below him thereon, if necessary to irrigate his land, even though those whose lands are nearer the mouth of the stream should have occupied them for years, and spent large sums of money in improving them and making a homestead thereon, prior to the fortunate settler above them. Surely the climatic and physical conditions of this country cannot be such as to create a law so at variance with natural equity and so fatal to the improvement and prosperity of our best agricultural districts. It must be apparent to all that the best agricultural lands in this Territory are not at the sources of the streams. Our broad valleys, as a rule, are better adapted by nature for settlement and agriculture than our narrow and rocky canons and mountain gorges. If we were called upon to say what were the necessities of this country, in regard to the use of water for the purposes of irrigation, we should reply that there was a demand that water should be used for that purpose, and that the considerations of the general welfare of the country and the principles of natural equity should guaranty to the prior appropriator of water

for such use the first right to the use of the same, to the extent of his necessities for domestic purposes, the quenching of the thirst of himself or animals, and for agricultural purposes.  We can see no reason why, if the common law is to be changed by the considerations above named, it should not be changed to suit the wants of the country and in accordance with the principles of equity.  We hold, however, that a law that is a part of a system of laws which our legislative assembly have adopted cannot be annulled or varied by a court, through any such considerations.

In the second place the common-law, upon the subject of riparian proprietors, is of a general nature.

In the third place, has this law been repealed or modified by the act of the legislative assembly or by act of congress?

The congress of the United States, by an act approved July 26, 1866, entitled "An act granting the right of way to ditch and canal owners over the public lands and for other purposes," provides "that whenever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing or other purposes have vested and accrued, and the same are recognized and acknowledged by the local customs, laws, and the decisions of the courts, the possessors and owners of such vested rights shall be maintained and protected in the same, and the right of way for the construction of ditches and canals for the purposes aforesaid, is hereby acknowledged and confirmed."

If the right to the waters of Prickly Pear creek have accrued to and become vested in the plaintiffs by priority of possession, and the right to the same has been acknowledged and recognized by the customs, laws, and decisions of the courts of this Territory, then there is no doubt but that the common-law doctrine, in relation to the rights of riparian proprietors, has been changed.  It is not denied in the answer but that the plaintiffs have appropriated a portion of the waters of the said creek.  The plaintiffs must recover, if at all, upon their right of appropriation.  They have based their right upon this, and not as riparian proprietors.

Ever since the settlement of this Territory, it has been the

custom of those who settled themselves upon any portion of the public domain, and devoted any part thereof to the purposes of agriculture, to dig ditches, and turn out the waters of some stream to be used to irrigate the same. This right has been generally recognized by our people. It has been universally conceded that this was a necessity in agricultural pursuits. So universal has been this usage that I do not suppose there has been a parcel of land to the extent of one acre cultivated within the bounds of this Territory that has not been irrigated by water diverted from some running stream. Both plaintiffs and defendants recognize this custom and the necessity of the same. Both are diverting water from the Prickly Pear creek for this purpose. If a practice so universal, and which has so long prevailed, does not establish a custom, it would be most difficult to do so. There have been but few disputes up to this time upon the subject of the use of water for the purposes of irrigation, and in not one of these, as far as we are informed, has the right to devote water to such a use been denied. It may safely be asserted the right to appropriate water for the purposes of agriculture have been recognized and acknowledged by the customs of this Territory.

In the second place, has this right been acknowledged and recognized by law? The first legislative assembly of this Territory passed an act upon the subject of irrigation. The first section of that act is as follows:

"That all persons who claim, own or hold a possessory right or title to any land or parcel of land within the boundary of Montana Territory, as defined in the organic act of this Territory, when those claims are in the banks, margin or neighborhood of any stream of water, creek or river, shall be entitled to the use of the water of said stream, creek or river for the purpose of irrigation, and making said claim available to the full extent of the soil for agricultural purposes."

The second section provides for the right of way for the construction of ditches, for the purpose of taking water out of a stream, creek or river for the purposes of irrigation. See Bannack Stat. 367, §§ 1, 2.

This statute was in force at the time the plaintiffs made their appropriation of water, and at the time the act of congress above referred to became a law. This statute, as far as it could, established and recognized the right of appropriation of water for agricultural purposes. Of course it could not establish this right as against the general government, or any person claiming thereunder. But as against any other parties the plaintiffs would have the right to the use of any water appropriated for that purpose if they are prior appropriators. As far as the legislative assembly of Montana had the power, they repealed the common-law doctrine in regard to riparian proprietors. If it is claimed that this statute does not recognize the doctrine of "prior in time, prior in right," the answer to this is, that when the law gives a man the right to divert water from a stream to irrigate his land to the full extent of the soil thereof, and in pursuance of this law he goes and digs a ditch, or constructs machinery for the purpose of taking water from a stream for this purpose at great expense, the principles of equity come in and say that no other man can come in-and divert this water away from him. That he is prior in time in availing himself of the benefits of such a statute, and his rights are prior to any subsequent appropriator. It is claimed by the respondents, and it would appear was held by the court below, that this statute had been decided to be void as in conflict with the organic act of this Territory. The decision referred to did not hold that the whole of this statute was void, but only a portion of it. The statute conferred upon certain officers, called commissioners, the right to apportion the water of any creek "having reference to the legal rights of the parties." This court held that this conferred upon these commissioners the power to determine what were the legal rights of the parties, that this was a judicial power, and that the judicial power of this Territory was vested in certain courts by the organic act, and that our legislative assembly had no authority to confer any portion of it upon the commissioners provided for in that act. The declaring of certain provisions of a statute void will not

certainly have the effect of declaring all of the provisions of a statute a nullity. One part of a statute may be good and one part bad. We can see no reason for holding any other portions of that statute void at this time than were declared such by the decision referred to. It was a rightful subject of legislation to repeal or modify the doctrine of riparian proprietors in this Territory so far as the same affected the possessory rights to the soil thereof. The fact that this law was subsequently repealed does not affect the decision in this case. The rights of the plaintiff had become vested and had accrued before that repeal. The repeal of a statute will not destroy vested rights. Another act recognizing the same right was enacted in its place. I hold, then, that the law of this Territory did recognize and acknowledge the right to the use of water for the purposes of irrigation, and that it recognized it in the prior appropriator, to the extent his soil could be devoted to agriculture and no further.

Thirdly, has this right been recognized and acknowledged by the decisions of the courts?

In California the courts have sustained the rights to appropriate water for mining purposes. The courts of this Territory have followed and repeatedly approved of those decisions. The legal grounds for sustaining such a right have been based upon the view that the unsurveyed lands of the United States, upon which any community settles, must be treated as belonging to no one. Hence, the one who first appropriates any portion thereof, or incident thereto belonging, for a beneficial purpose, would become the owner thereof until the general government, or some one claiming thereunder, should assert title to the same. The right of the first appropriator to unowned property has always been recognized and protected by the common law. Of course this right can be regulated by law. The California decisions hold that there is no difference between the appropriation of water for mining and milling purposes. *Ortman et al.* v. *Dixon et al.*, 13 Cal. 33 ; *McDonald & Blackburn* v. *The Bear River and Auburn Water & Mining Company*, id. 220.

In this case the court hold the following language : "We have held that there is no difference in respect to this use, or rather purpose to which the water is to be applied, at least, that an appropriation for the use of a mill stands on the same footing as an appropriation for the use of mines."

We would be justified in the inference from this language that that court did not make any difference in the use or purpose for which water was appropriated, if the use was a beneficial one.

The courts of this Territory, and of California, have sustained the right to appropriate agricultural land for agricultural purposes upon the unsurveyed public domain. The water that flows over land is but an incident to it. There are no grounds upon which a court could sustain the right to appropriate land that would not apply to the right to appropriate the water flowing over land, an incident to the land itself. To give the one right and deny the other, would be the granting of the right to a party to appropriate every vestige of a piece of property and deny him the right to appropriate a small portion thereof. The right to appropriate water for mining or milling purposes, resting in this country before the act of congress above referred to, upon the grounds that no one owns the property, and that the appropriation is for a beneficial purpose, establishes a principle that certainly ought to allow the appropriation of water for the purposes of irrigation. In this latter case no one, it would be presumed, owned the water, and the appropriation would be for a beneficial use.

Whenever a legal rule is once established by legal decisions, it controls all cases which come within the reason of the rule. "Adjudged cases become precedents for future cases resting upon analogous facts and brought with the same reason." 1 Kent's Com. 537.

"*Ubi eadem ratio ibi idem jus*" is a familiar legal maxim, one which courts of law have long acted upon in arriving at legal determinations.

Broom, in his work on Legal Maxims, page 131, shows how a decision in relation to the alteration of a deed or bond

was declared to be authority in the alteration of a bill of exchange and a promissory note, because the reason of the rule established in the former cases was applicable to the latter, and finally the decisions in these were held to be authority in the case of the alteration of a guaranty for the same reason.

"The law consists not in particular instances and precedents, but in the reason of the law, for reason is the life of the law." Broom's Legal Maxims, 130.

The reason of the rule that allows parties to appropriate water for mining or milling purposes being such that it would fully sanction the appropriation of water for the purposes of agriculture, and there being no reason why the courts should sustain the right to appropriate land and deny the right to appropriate water, a mere incident to land, for the purposes of irrigation, I think we can safely say that the appropriation of water for that purpose has been acknowledged and recognized by the decisions of the courts. To hold otherwise, because no decision had been made in this Territory maintaining the right to appropriate water for this identical purpose, would be "sticking in the bark" and ignoring the spirit of the law, and disregarding the maxim of which our common-law jurisprudence has been so boastful, that reason is the soul of the common law.

The right to appropriate water for the purposes of irrigation having, in our opinion, been acknowledged and recognized by the customs, laws and decisions of the courts of this Territory, the law of congress comes in and says that whenever, by priority of possession, the right to the use of water for this purpose "have vested and accrued," "the possessors and owners of such vested rights shall be maintained and protected in the same."

This is in effect a grant to such parties of this right. It appears from the statement of the evidence in this case, that all of the parties to this action now own the government title to their lands. But this will not vary the rule above established in this case. Whatever rights the parties had in relation to the waters of the Prickly Pear creek, vested

before any of these parties acquired their rights to the land under the general government. This decision, it will be understood, does not go to the extent of allowing parties to appropriate and divert water so as to prevent the same from flowing over land to which a party had obtained the government title after the acquisition of this title. If no one before the pre-emption and entry of land by a party has acquired the right to divert the waters of a stream, then the patent from the general government conveys the water as an incident to the soil over which it flows. If it has been appropriated before the time when the patent takes effect, it does not.

It is claimed, however, that this act of congress was only to affect settlers upon the public domain as long as it remained unsurveyed and was not open for pre-emption and entry. There is no reservation of this kind in the act itself. And to show that this was not the intention of congress we have an amendment to that act, approved July 9, 1870. A part of the seventeenth section of this amendatory act is as follows :

" And be it further enacted, That none of the rights conferred by sections 5, 8 and 9 of the act to which this act is amendatory shall be abrogated by this act, and the same are hereby extended to all public lands affected by this act, and all patents granted or pre-emption or homesteads allowed, shall be subject to any vested and accrued water rights or rights to ditches and reservoirs used in connection with such water rights as may have been acquired under or recognized by the ninth section of the act of which this is amendatory."

This part of that section clearly demonstrates that congress did not and does not intend that the rights granted by section 9 of the previous act should be confined to the unsurveyed public domain. This amendatory, or rather confirmatory, section only declares what the courts would have been compelled to hold was the legal effect of section 9 of the previous act. A grant of a right cannot be divested by a subsequent grant. The words used in section 9 were, as

we have said, in effect a grant. A grant made by law is as effectual as a grant made by deed or patent. And a subsequent grant of land would be subject to any previous grant of a water right. After a full consideration we are impelled to the conclusion that the right to appropriate water for the purposes of irrigation in this Territory stands upon as good, if not a better, footing as the right to appropriate water for mining purposes. This right has been and is subject to be regulated by law. And that the doctrine in relation to riparian proprietors has been abrogated to a considerable extent. Before the government title to land, over which water flows, has been acquired by a private person, such water may be appropriated and diverted in accordance with legal provisions. Afterward it cannot, and the doctrine of riparian proprietors would prevail as to it.

The case of *Vansicle* v. *Haines*, 7 Nevada, cited in this case, is not in point. In that case the government had parted with the title to the soil over which the water flowed before the act of congress of July 26, 1866, above referred to. The patent to Haines of the soil before the passage of that over which the water flowed carried with it the water as an incident thereto, and after the government had parted with this incident to the soil it could not grant it to any one else. I certainly agree with the opinion of the court in that case.

Having arrived at the legal rules by which we will be governed in relation to the appropriation of water for the purpose of irrigation, we come now to the consideration of whether under the issues presented in this case and the facts found by the court any rights of the plaintiffs have been infringed so as to entitle them to the injunction prayed for in their complaint.

The plaintiffs aver in their complaint that during the years 1865, 1866 and 1867 they appropriated all of the waters of Prickly Pear creek for the purposes of irrigation. That all of the waters of said creek are necessary to irrigate their lands, which they aver they located during the same years they appropriated the water, and that the said lands are upon and contiguous to the said creek. That all of the

·waters of said creek are necessary to irrigate their land, and was used by them for that purpose, and without it they would be unable to produce any crop, and aver that the defendants have diverted and used the water of said creek appropriated by them, and continue and threaten to continue to do so.

The defendants deny that the plaintiffs appropriated all of the waters of Prickly Pear creek. Deny that all of the waters of said creek are necessary to irrigate the land of the plaintiffs, and deny that they have diverted more than five hundred inches of the water of said creek, and aver that their appropriation of the same was prior to any appropriation of the plaintiffs thereof. There are other issues presented in the pleadings. These are enough, however, for the purpose of determining the points presented.

The court refused to grant the injunction prayed for by plaintiffs and gave the defendants judgment for costs.

The plaintiff moved for a new trial, and as grounds therefor assigned the following list of errors:

1. The court erred in refusing to grant the plaintiffs the injunction prayed for in their complaint.

2. The court erred in ordering judgment to be in favor of defendants and against the plaintiffs.

3. The court erred in its finding of fact.

4. The court erred in its conclusions of law.

5. That the findings of both law and fact are against the evidence.

There are no other specifications of error in the record than the above. This assignment of errors is so general that, as has been frequently held by this court, they cannot be considered. This court, in this particular, has followed those of California. See *Hutton* v. *Reed,* 25 Cal. 483 ; *Partridge* v. *San Francisco,* 27 id. 415 ; *Fitch* v. *Bunch,* 30 id. 208.

The assignment of error should point out wherein the error was committed. Upon that distinct point, our practice act provides: "When the notice designates as the ground upon which the motion will be made, the insuffi-

ciency of the evidence to justify the verdict, or other decision, the statement shall specify the particulars in which such evidence is alleged to be insufficient."

In this case there was no verdict, the cause being a chancery one and no findings of fact by the court. When the court fails to file any findings, the presumption of law is that the court found every material issue in the case against the losing party and in favor of the party that was successful. The opinion of the court cannot be treated as a finding of facts. It is not what is contemplated by the statutes of this Territory as a finding of facts. Our statute upon this subject is the same as that of California. The courts of that State have held that it cannot be treated as such. See *Hidden* v. *Jordan*, 28 Cal. 305; *McClory* v. *McClory*, 38 id. 575.

The statement does not specify the particulars in which the evidence is insufficient to support any of the findings of fact which the law presumes were found. Treating the opinion of the district court as a finding of facts, and the statement does not specify the particulars in which any thing expressed therein which could be considered as a finding of fact, is unsupported by the evidence. Under our statute, then, the statement must be disregarded. Laws of 1867, p. 172, § 195.

Although there may in fact have been errors in the findings of facts, which this court will presume were found by the court below, we have no means of reviewing them.

The material issues having been found against the plaintiffs and in favor of the defendants, there certainly was no error in law for the court to refuse to grant the injunction asked for by the plaintiffs, unless the defendants in their answer raised no material issue which it was necessary for the plaintiffs to establish in order to entitle them to recover. No such claim is made by the appellants. This court will not reverse a cause because it holds that the reasons a court may have given for his decision were erroneous.

*Judgment affirmed, with costs.*

WADE, C. J. I concur with Justice KNOWLES, that the

judgment of the court below should be affirmed, with costs, but being unable to agree with him as to some of the doctrines enunciated in his opinion herein, and the questions involved in this case being of absorbing and general interest, I feel justified in stating my views thereon.

Both the plaintiffs and defendants have acquired title from the government to the lands they possess. They are the absolute owners thereof. The plaintiffs' farms are situate on, contiguous to and in the neigborhood of the Prickly Pear stream, below the farms of the defendants. The defendants' farms are situate on and contiguous to said stream, and above those of the plaintiffs. The plaintiffs located their farms in 1865, 1866 and 1867, and claim to have appropriated all the waters of said Prickly Pear stream. The farms of defendants were located subsequently to those of plaintiffs, and their appropriation of water for the purpose of irrigating their said farms was subsequent to that of the plaintiffs. The plaintiffs claim all the waters of the stream by virtue of their said appropriation, and bring this action to restrain the defendants.

It is claimed that the local customs, laws and decisions of the courts of this Territory authorized the plaintiffs to hold said waters by virtue of their prior appropriation ; and also that the law of congress of July 26, 1866, quoted in the foregoing opinion, establishes plaintiffs' right.

It will be observed that three things must concur before this act of congress can, in any manner, affect the rights of the parties here, if it is at all applicable to the questions at issue.

*First.* The plaintiffs' right to appropriate such waters must be recognized and acknowledged by the local *customs* of the Territory.

· *Second.* This right must be established by the *laws* of the Territory ; and

*Third.* It must be acknowledged and recognized by the decisions of the courts.

Under and by virtue of this law of congress, it is not enough to say that this right of appropriation is established

by the local *custom*, nor is it sufficient that the law author-
izes it, or that the *decisions* of the courts uphold it, but all
three of these requisites must concur and affirmatively exist
to establish this right.

There is no proof whatever in the case tending to show
the existence of any peculiar local custom or usage within
the district where these lands are located authorizing the
appropriation of said waters by the plaintiffs. And to say
there is such custom, we must do so in the absence of any
proof to establish the fact, and, as I believe, when the fact
itself does not exist.

What is a custom, and how does it become a part of the
law? In the first place it must be *certain*. It must be
clearly defined and unmistakable. It must be free from
doubt. And it must be *reasonable*. It must not be incon-
sistent with itself. Customs cannot make a contradictory
or unreasonable law. It must be *continuous*. It must have
existed uninterruptedly for a long period of time. Every
custom varying the general law presumes a grant at its in-
ception. To establish a local custom derogating from the
general law, it is not enough to prove that the act has been
frequently done; it must be shown to be so generally
known and recognized that a fair presumption arises, that
the parties entered into their contract with a silent refer
ence to it.

A custom is only obligatory upon the parties when the
law does not provide for the case. A local custom, opposed
to the provisions of a statute, is not binding. This is the
general law upon the subject of customs, and there is
nothing in the case to intimate that the local usages and
rules of the district where this controversy arose have, in
any manner, varied or changed the general doctrine upon
the subject of customs. So we are compelled to resort to
the general law in order to ascertain what a custom is.

This Territory was organized in 1864, and hardly a set-
tlement in it is eight years' old, and the notion that a cus-
tom can grow up in that short period, and become a part
of the established law of the land, it seems to me violates

every rule applicable to customs. It is certain enough that men have taken up and claimed to appropriate the waters of the streams of this Territory, but ever since the settlement of the Territory, the question as to the right to do this has been in constant litigation, and the right has not been established or acquiesced in.

Let us inquire how this doctrine, that prior appropriation of water carried with it priorty of right, first made its appearance.

When the mineral lands of California were discovered, people flocked there by thousands. The lands they entered upon belonged to the government and were unsurveyed. They were simple trespassers upon the public domain, and the courts of California held, *for the reason that they were trespassers* and had no rights upon the grounds they were occupying, that the first trespasser who took up and appropriated water could hold it against a second trespasser. This was a correct holding under the peculiar situation, and the peculiar circumstances of the case, but this doctrine grew out of these peculiar and anomalous circumstances, and had its foundation in the fact that the occupiers of these mineral lands were trespassers. This doctrine was never applied to agricultural lands in California, for the whole reason thereof falls to the ground when the government comes to part with its title, and sells its lands to actual purchasers.

And because this principle of "prior in time, prior in right" became thus established in California, as applied to mineral lands of the public domain, an effort has been made in this Territory to apply the same doctrine to agricultural or farming lands, but the principle has never been acquiesced in by the people, and is now in litigation all over the Territory. And it seems to me perfectly clear that the reason for the doctrine as applied to trespassers upon the public domain, utterly fails when applied to actual purchasers from the government of agricultural lands.

So we say the principle of "prior in time, prior in right," as applied to the appropriation of water for the purposes of

irrigation, is not an established custom of the country. This alone would make inoperative the act of congress of July 26, 1866. But let us inquire if this principle is established by the statutes of the Territory.

It is claimed by the act of the Territorial legislature of January 11, 1865, that priority of appropriation carries with it priority of right, and two sections of said act are quoted in the opinion of Justice KNOWLES, to establish this view of the statute. We submit that in the construction of this statute it must be taken as a whole, and we have the right, and it is our duty, to look at the whole statute in order to arrive at the intention of the legislature. And looking at the whole statute, we say most unhesitatingly, that the whole purpose of the statute was to utterly abolish and annihilate the doctrine of prior appropriation, and to establish an equal distribution of the waters of any given stream in the agricultural districts of the Territory.

The fourth section of said act provides: "That in case the volume of water in said stream or river shall not be sufficient to supply the continued wants of the entire country through which it passes, then the nearest justice of the peace shall appoint three commissioners as hereinafter provided, whose duty it shall be to apportion in a *just* and *equitable* proportion a certain amount of said water upon certain alternate weekly days to different locators, as they may in their judgment think best, for the *interest of all the parties concerned*, and with due regard to the legal rights of all."

If this section of the law does not mean that there shall be an equal distribution of the waters of a stream among all the parties concerned in such water, without any regard whatever to the date of location or appropriation, then we are utterly unable to comprehend the language used. It provides that the commissioners shall apportion the waters of the stream in a just and equitable manner among all the parties along the stream. Suppose one man had appropriated all the waters of a stream, and twenty other men lower down had and owned farms through which the

stream ran, can it be doubted that under this statute the commissioners would have been compelled to apportion the waters of the stream among the riparian owners equally? It seems to me the question does not admit of a doubt.

Then the doctrine contended for is not established by the Territorial statute of 1865, and again, does the law of congress of July 26, 1866, become inoperative?

It is not claimed that the decision of any court, either in this Territory or California, has pretended to establish the doctrine of prior appropriation as here sought to be applied to agricultural lands.

Then there being no local custom, no local or statute law, and no decision of any court establishing the principle contended for, it is evident enough that no one can acquire any vested rights under and by virtue of the act of congress of July 26, 1866, for this act only claims to authorize and permit what is already established by the local customs, laws and decisions of courts.

Then how are the rights of these parties to be settled and determined? The act of the legislature of January 11, 1865, having been declared void by the supreme court and subsequently repealed by the legislature, and the act of congress of July 26, 1866, not applying to the case in any respect, we are necessarily compelled to look to the common law to settle the questions at issue. The common law is in force in this Territory, when not in conflict with the statute laws. In the Bannack statute, p. 356, it is enacted:

"That the common law of England, so far as the same is applicable and of a general nature and not in conflict with the special enactments of this Territory, shall be the law and rule of decision, and shall be considered as of full force until repealed by legislative authority."

We therefore have now arrived at a point in this investigation where we are authorized and required to go into an examination of the rights of riparian owners as at common law, and also to the applicability of that law to the wants, needs, circumstances and conditions surrounding the people of this mountain and mineral region; and it would not be

unsafe to say, that the common law, so sacred to every lawyer and jurist, and formed as it was from the customs, usages, habits and thoughts of a people of a different climate from our own, where the rains caused an abundance of moisture for farming and agricultural purposes, and the annual crops were produced and perfected without the aid of irrigation, cannot be followed in its strictness and its technicality in a country where the physical conditions and the nature of the climate renders it impossible. But if we can discover the reason of the law, and the principles upon which it was founded, and the natural wants and requirements of the people for whose prosperity and benefit the law was instituted and established, we have then a foundation from whence, by analogy and deduction, we can apply the principles we have found to other peoples, surrounded by other and different circumstances, wants and conditions. And so the principles and the reason of the common law adapts itself to every climate, and to the physical conditions of every country, as dictated by the natural wants of the people in whose behalf the law is invoked.

If the common law cannot be taken as authority from whence the rights of these parties are to be eliminated and determined, then we have no law on the subject, and neither of the parties here have any definable rights in the premises. But we hold that the common law is applicable to the case in hand, and that it settles and determines the rights of the parties to this litigation justly and with explicit certainty. The common law declares that a stream begins at its source where it comes to the surface, and the owners of lands adjoining it have a natural right to the use of the water from its source to its termination.

We maintain this as the established uniform doctrine of the common law : that a water-course is essentially a part of the freehold through which it passes, and the authorities abundantly uphold this position. We will cite a few of them :

" A river or stream, of common right, belongs to the proprietors of the land between which it runs, to each that part

nearest the land, and this rule is mainly derived from the fact that the riparian proprietor is the owner of the soil under the water, and by the general law of property becomes entitled as of right to all accessories. And therefore it is that a grant of land conveys to the grantee not only the field or the meadow, but all growing timber or water, standing or being thereupon, and thus it is that a stream of water becomes the property for certain uses of the owner of the soil over which it passes. It has therefore been held that the right to a water-course is a part of the freehold of which no man can be disseized but by due process of law." Ang. on Water-Courses.

"The owners of water-courses are denominated by the civilians *riparian proprietors*, and the use of this term is now fully introduced into the common law. The soil of the bed of the stream, and consequently the water, may be, and most often is, divided between the two riparian owners; that is, the land on one side may be owned by one person and on the opposite side by another; when such is the case, each proprietor owns to the middle of the stream. There is but one difference between the stream running through a man's land and one which runs by the side of it; in the former case he owns the whole and in the latter but half." *Starr* v. *Chiel*, 20 Wend. 149.

" If the proprietor of a large tract of land through which a stream of water flows sells parcels thereof above and below him, each grantee would take his parcel with full right to use the flowing water on his own land, subject to the same rights as proprietors above him." Ang. on Water-Courses.

"It is a settled principle of law, that owners of lands on the banks of fresh water rivers, above the ebbing and flowing of the tide, has the exclusive right of fishing as well as the right of property opposite their respective lands, *ad filum medium acquæ*. And, when the lands on each side of the river belonged to the same person, he had the exclusive right of fishing in the whole river, so far as his land extended along the same." 3 Kent, 411.

Land, says Lord Coke (4 Co.), in legal signification, com-

prehendeth any ground, soil or earth whatsoever, as meadows, pastures, woods, moors, waters, marshes, fruses and heath. *Terra est nomen generalissimum et comprehendit omnes species terræ.*

"The only mode by which a right of property in a watercourse above tide water can be withheld from a person who receives a grant of the land, is by a reservation directly expressed or clearly implied to such effect. If the intention of the grantor is not to convey any interest in the water, or any portion of it, he can exclude it by the insertion in the instrument of conveyance, of proper words for the purpose of so doing ; but, in the absence of such words, the bed and consequently the stream itself passes by the conveyance." Ang. on Water-Courses.

"The uses of the waters of private streams belong to the owners of the land over which they flow. They are as much individual property as the stones scattered over the soil." 10 Ohio, 297.

"A right to a stream of water is as sacred as a right to the soil over which it flows. It is a part of the freehold of which no man can be disseized but by the lawful judgment of his peers or by due process of law." *Gardner* v. *Village of Newburg,* 2 Johns. Ch. 166.

In a note to *Ex parte Jennings,* 6 Cow. 543, it is held : "The general distinction, deemed of so much excellence and importance by the learned judges, and which at this day no lawyer will hazard his reputation by controverting, is, that rivers not navigable, that is, fresh water rivers of what kind soever, do of common right belong to the owners of the soil adjacent to the extent of their land in length ; but that rivers where the tide ebbs and flows belong, of common right, to the State ; that this ownership of the citizen is of the whole river, viz. : the soil and the water of the river."

In *Wadsworth* v. *Tillotson,* 15 Conn. 372, speaking of water-courses, the court say : "This right is not an easement or appurtenance, but it is inseparaby annexed to the soil, and is parcel of the land itself."

"The right to flowing water is now well settled to be a right incident to property in the land." *Elliott* v. *Fitchburg Railroad Co.*, 10 Cush. 193.

In *Johnson* v. *Jordan*, 2 Metc. 239, speaking of flowing water, the court say: "It is inseparably annexed to the soil and passes with it, not as an easement, nor as an appurtenance, but as parcel. Use does not create it, and disuse cannot destroy or suspend it." In *Page* v. *Williams*, 2 Dev. & Bat. 55, the court say: "The common right here spoken of is not that existing in all men in respect to things *publici juris*, but that common to the proprietors of the land on the stream. And as between them the use to which one is entitled is not that which he happens to get before another, but it is that which, by reason of his ownership of land on the stream, he can enjoy on his own land and as appurtenant to it." In *Davis* v. *Fuller*, 12 Vt. 190, the court say: "The owner of land has rights to the use of a private stream running over his land peculiar to himself as owner of the land, not derived from occupancy or appropriation, and not common to the whole community. It is the right to the natural flow of the stream. Of this right he cannot be deprived by the mere use or appropriation of another, but only by grant, or by the use or occupancy of another for such length of time as that therefrom a grant may be presumed." For further authorities upon this subject, we refer to the case of *Vansickle* v. *Haines*, 7 Nev. 257.

The water in a stream thus becoming a part of the freehold itself, and passing with the freehold as incident to it, to whom does this water belong in streams upon the public domain, before the government has parted with its title? It will not be denied that it belongs to the government, and that when it conveys a title to the land, the waters flowing over or through the land pass with the grant, and the grantee thereby requires all the rights and all the title of the government.

The right to the waters of a flowing stream thus becoming a part of the freehold and passing with the land, to

what uses can each proprietor put the water as it flows through his land?

By the general law applicable to running streams, every riparian proprietor has a right to what may be called the ordinary use of water flowing past his land; for instance, to the reasonable use of the water for domestic purposes and for his cattle, and this without regard to the effect which such use may have, in case of a deficiency, upon proprietors lower down the stream. But, further, he has the right to use it for any purpose, or what may be deemed an extraordinary use of it, provided he does not thereby interfere with the rights of other proprietors either above or below him. Subject to this condition, he may dam up the stream for the purposes of a mill, or divert the water for other purposes, but he has no right to interrupt the regular flow of the stream if he thereby interferes with the lawful use of the water by other proprietors and inflicts upon them a sensible injury. 12 Moore's P. C. 156. In other words, each riparian proprietor has the right to use the water of the stream to quench his thirst, for culinary purposes, and for the use of his cattle, and this, although such use may injure the proprietor of the lower estate, and he can use the water for other and speculative uses if he does not thereby interfere with the flow of the stream, or diminish its quantity or quality.

Thus speaks the law in a country where the rains sufficiently moisten the earth to produce and ripen the fruits thereof, and where irrigation for the purposes of agriculture is unknown, and it will be observed with what zealous care the streams and water-courses are guarded and protected, and the reason for this care is, the fact that the waters of a flowing stream, as it enters the lands of the different proprietors, and while it remains thereon, becomes a part of the freehold, and as it is supposed to be used to support and sustain life, and derives its value from this important use, the law declares that it must enter the lands of each proprietor, through which the stream passes, undi-

minished in quantity, and so pure and unpolluted as to be fit for the primal use and purpose.

Now, it must be kept steadily in mind that the common law upon this subject is the law of this Territory, so far as the same is applicable to our peculiar situation and circumstances. And following the reasons and the analogies of the common law, we ask to what uses may the waters of a stream be applied by the riparian proprietors thereof, who are engaged in the pursuits of agriculture and farming, in a dry and arid country, where the scarce rains do not sufficiently moisten the earth, and irrigation is necessary to the successful production of crops ? We must remember that water, by the general law, can be used to sustain life and for domestic uses by each owner of the land through whose land the stream passes ; that is to say, it can be applied to the uses which are absolutely necessary for the well-being and civilization of society. And we say that, in the country we have described, with such necessities and conditions, and in the agricultural districts thereof, this proposition can be successfully maintained : that water for the purposes of irrigation naturally belongs to each riparian proprietor in certain quantities, as water for culinary purposes belongs to such proprietor at common law. Evidently the proportions and the quantity of water that can be thus used should be clearly and absolutely defined by appropriate legislation or by common consent, which would soon grow into a custom having the force and effect of law. Unless the common law can be thus modified and extended (if such use of water is a modification of that law), irrigation for agricultural purposes would be absolutely prohibited, for the common law is the only law in force here upon the subject, and no modification of the common law is required in order to authorize the use of water in a flowing stream by the riparian owners thereof for the purposes of irrigation.

Water for the purposes of irrigation in this country is equally necessary as water to sustain life. They are terms implying the same thing. The resources of the country cannot be developed, and our valleys cannot be reclaimed

and become inhabited, unless the waters of the streams can be used in an equitable manner, to cause the earth to bring forth its fruits.

So, then, we say that water for irrigation in this country as naturally belongs to the lands through which the stream passes, in certain proportions as in other countries it belongs to the land to supply the necessities of life. Irrigation in this country is what rain is to other countries, and a monopoly of one would be equally as appropriate as that of the other, and equally sustained by any principle of justice and equity. As in other countries, the rains come to the prior and to the subsequent locators of lands upon a stream in equal proportions, so in this arid country should the waters of any given stream be divided equally among the farmers for the purposes of irrigation.

The law in aid of justice and equity must conform to the peculiar and unusual conditions surrounding each country where it is administered, and the farming interests of this Territory can only be crowned with success when a fair and equitable distribution of our scarce waters is accomplished.

Let us examine the doctrine in an agricultural community, as the same is applied to mining districts, that the first appropriators of the waters of a stream acquire an absolute property therein as against every one, and that they can hold the same as against all subsequent appropriators thereof, and as against the government when it comes to sell its lands lower down the stream.

In the first place, this doctrine leads to a monopoly of water, which, in the language of one of the witnesses in this case, "is more precious than gold." An illustration may be useful. Suppose that ten men own each a farm of one hundred and sixty acres, upon the banks of a stream, whose volume is three thousand two hundred inches of water, and with ditches appropriate the waters of such stream. If two inches of water is necessary for the successful irrigation of one acre of land for the season or three hundred and twenty inches for one hundred and sixty acres, each man would be entitled to three hundred and twenty inches, or ten men

to three thousand two hundred inches. And if each of these men, year after year, should not wish to cultivate but sixty acres of their land, or six hundred acres altogether, yet they would hold the two thousand inches of water they did not use; and if subsequent locators above them on the stream should attempt to appropriate any of the waters thereof, an injunction would restrain them from so doing, and thus one thousand acres of land would be lost to cultivation.

The prior appropriator, by virtue of this doctrine, can hold sufficient water to irrigate the land he locates, and if he takes up one hundred and sixty acres of land, he can also appropriate sufficient water to irrigate the same, and yet he may not in fact, and may never intend to cultivate more than one-third of his land. Can the subsequent appropriator of water, or the subsequent locator of land along the banks of a stream, be deprived of the use of water in this manner, and especially in a country like this, where every drop of water should be made available for the purposes of agriculture and farming?

Is it not the true policy of this Territory to erect such a system of laws here as shall distribute our short supply of water to the best advantage to all our people? The common law applied to this country is ample and sufficient to secure this much desired end.

An examination of this doctrine of prior appropriation, and the rights thereby supposed to accrue, as it affects the interests of the general government, may not be out of place. The United States is the original proprietor of the soil; and as such has the right to make a final distribution thereof. This is a sovereign prerogative inherent in every government. The proceeds of the sale of the public lands is a fruitful source of revenue to the government, not only as to the amount received, but in a much larger sense; in extending the area of our civilization and opening up to our ever-increasing population cheap lands for cultivation and improvement. Now, if the doctrine of prior appropriation is to prevail, this consequence must inevitably result:

A few men will locate their farms near the mouth of a
stream and appropriate the waters thereof, and any subse-
quent locators up the stream would be guilty of a trespass
if they undertook to use any of the waters thereof, and an
action could be prosecuted and maintained against them.
The result is, that thousands of acres in our valleys must
remain barren deserts, while, with an equal and just distri-
bution of water, all might be cultivated. Thus the prior
appropriator renders vast tracts of land utterly worthless,
and their sale is lost to the government and their cultivation
to the people. Such a doctrine is against public policy and
cripples the life of the industries of the Territory.

The doctrine of prior appropriation goes to the extent of
declaring that he who first appropriates the waters of a
stream upon the government lands thereby acquires an abso-
lute property therein, as against all the world, which prop-
erty is capable of being bought and sold, mortgaged, devised,
inherited and transmitted, from generation to generation,
like other property. We maintain just the contrary, and
say that the title to water thus appropriated still remains in
the government notwithstanding such appropriation; and
that the government, when it conveys its title to a purchaser,
conveys a title to the land, and a title to the stream of water
passing through it, as incident thereto, and as a part and
parcel of the freehold, and that no appropriation in any
manner affects the ability of the government to convey its title.

Let us suppose that A, by means of a ditch, appropriates
the waters of a stream, and that he is the first appropriator
thereof. It will not be denied that the government was
once the owner of this water, and that it still owns the same
will not be denied, unless by reason of some grant or license
it has parted with its title; but no such conveyance is
claimed, and the whole claim is, that the locator takes up,
appropriates and converts to his own use the waters of the
stream, which water is confessedly the property of the gov-
ernment, while yet the government is absolutely passive in
the matter; the meaning of which is, that the appropriator
simply converts to his own use and benefit the property of

the government.   Such conversion does not change the title to the property and it still remains in the government.   The government being thus the owner of the water as well as the soil through which it flows and passes, and having the right to sell and dispose of the same, absolutely and without condition, when it comes to sell to a subsequent locator upon the supposed stream, what interest does the purchaser thereby acquire ?   What rights does the grantee thereby succeed to ?   Does he obtain by his purchase the bare soil and no title or interest in the water flowing through it ?   It must not be forgotten that the stream of water is an incident to the land, and is a part and parcel of it, and we say a purchaser under such circumstances from the government takes all the title of the government.   The purchaser succeeds to all the rights of the grantor.   If so, an inquiry into the rights and the title of the government in the premises is in point.   That the government is the absolute owner of all the public lands to which the Indian title has been extinguished is a proposition so clear and certain that a reference to authorities seems to be unnecessary.   That it can sell and dispose of such lands, and thereby convey a perfect title, and that it can protect and defend such property against any and all trespasses and wrongful acts, is equally certain and beyond question.

In the case of *Vansickle* v. *Haines*, before referred to, the court say : " It is a proposition universally admitted that the United States is the unqualified proprietor of all public lands to which the Indian title has been extinguished.   Certainly there is none other who has any right to or claim upon it which in any way qualifies the right of the federal government.   Although it has sometimes been suggested that the unoccupied lands belonged to the several States in which they may be located, the suggestion has never received the serious sanction of statesmen or the courts of the country.   On the contrary, it is the universal language of the judges that the unqualified right of property is in the United States.   ' The English doctrine in relation to real estate is that there can be no adverse possession against the

crown, nor against its grantee until there be a new entry
after the grant.   An entry on land belonging to the crown
is held not to be a disseizin, but a mere intrusion on the
king's possession.   His possession is not thereby divested,
but in legal contemplation still continues.   The king, not
being disseized by the entry, his conveyance of the freehold
is good and his grantee is seized by virtue of it.   The
grantee succeeds to the rights of the crown, and cannot be
disseized without another entry after the conveyance.   The
individual making the original entry acquires no new right
by the conveyance, but only continues his old interest, and
remains an intruder still, liable to be sued in trespass.'
Bacon's Abr. 331.

   'There can be no doubt but that the same principles are
applicable to the government of the United States.   It pos-
sesses the same right of sovereignty and prerogative in
respect to the public lands.   By the right of eminent do-
main it is the absolute and exclusive owner of all the pub-
lic lands which it has not alienated or appropriated.   It is
seized of them to as full an extent as the British govern-
ment can be of its domain.   It cannot be disseized; no
adverse possession is created by an entry on its lands.   Pos-
session thus acquired can never ripen into a right nor
authorize any defense against the government.   The gov-
ernment may treat the person thus in possession as an intru-
der and sue him in trespass.   On the sale of lands by the
United States the patent transfers to the purchaser the entire
legal estate, and seizin to as full an extent as the government
held them.'   2 Gilm. 651.

   'It cannot be denied that all the lands in the Territories
not appropriated by competent authority before they were
acquired, are in the first instance the exclusive property of
the United States, to be disposed of to such persons, at such
times, in such modes, as the government may deem most
advantageous to the public, or in other respects may deem
most politic.'   *Irvine* v. *Marshall,* 20 How. 561."

   The government thus being the owner of the absolute
title to the public domain, it can protect the same against

any trespass thereon. *Jourdan* v. *Barratt*, 4 How. 185. "In this country the lands of the United States lying within the States are held and subject to be sold (under the authority of congress), as lands may be held and sold by individual owners, or by ordinary corporations, and similar remedies may be employed by the United States, as owners, that are applicable in cases of others." *Bagnell* v. *Broderick*, 13 Pet. 450. So the government may lease any portion of the public domain. *United States* v. *Gratiot*, 14 Pet. 526. And the government is entitled to the same remedies, to protect such lands, as individuals have to protect their lands. *United States* v. *Gear*, 3 How. 20 ; *Cotton* v. *United States*, 11 id. 231.

Then we are safe in saying that the government of the United States has an absolute property in the soil of the public domain, and in the waters flowing over or upon the same, and has a right to sell both, and the water flowing over, upon, or through such lands passes with the land, as incident thereto, and as a part and parcel thereof, and a purchaser takes the whole of the grantee's title, both as to the land and as to the water thereon.

In the case before us, both plaintiffs and defendants have acquired titles to their lands from the government, and when the title passed from the government to riparian owners, the rights acquired by prior appopriation, as applied to government lands while the title is yet in the government and the occupiers are mere tenants at will, is not applicable and falls to the ground. Conceding the fact, that the government retains the right to the final disposition of the soil and the waters flowing over the same, and this result must inevitably follow, and each purchaser from the government, of lands along a stream, acquires all the title of the grantor, and this title carries with it property in the soil and waters naturally flowing over the same. If this is not the case the prior appropriator takes title to the water as against the government.

We therefore conclude that the doctrine, that he who first appropriates the waters of a stream can hold the same

as against subsequent riparian owners, for the purposes of irrigation and agriculture, is inapplicable to lands situate along the banks of a stream where title to such lands has passed from the government to riparian owners, for the very act of transferring the title carries with it the freehold, and this includes a title to the water that flows over or along the boundary of the lands thus transferred ; and the act of congress of July 26, 1866, is not at all in conflict with this view of the case. That act is applicable to rights acquired while the title yet remains in the government, and the occupiers are mere tenants at will ; and then the doctrine of prior appropriation is only applied when the same is established and sustained by the local customs, laws and decisions of the courts, and we believe we have conclusively shown that there are no such local customs, laws and decisions in force in this Territory.

And it is safe to say that the territorial legislature has no power or authority to enact a law establishing the principle contended for by appellants. The organic act, section 6, in defining the powers of the territorial legislature, declares that "no law shall be passed interfering with the primary disposal of the soil," and, therefore, any law of the legislature that in any manner depreciates the value or worth of the soil, and the property of the United States therein, is such an interference with its disposal as would render any such law nugatory and void. And if the doctrine of prior appropriation, and the supposed rights incident thereto, as it manifestly does, causes the lands of the government to become utterly worthless, making it impossible to dispose of the same, where before the application of such doctrine or the accruing of such supposed rights said lands were valuable, such legislation would be in conflict with the rights of the United States, and a palpable violation of the organic act, and therefore void.

If this decision necessitates the adoption of the common law respecting running water, and the manner in which the same may be used and the rights incident thereto, we can see no objection to it on that account. It may operate un-

justly in certain peculiar cases, but as a general rule it will secure justice and equity. Whenever any old and long-established rule or principle of law is to be modified or changed, it should be done with the greatest care and prudence, for such rule or principle generally speaks the wisdom of long experience, much thought and much learning, and should not be inconsiderately trifled with. We believe our Territory should not form an exception to the just operation of the rules and principles that govern and control the rights and remedies incident to running water. We have arrived at this conclusion after much thought and study, having in view solely the interests of our people and the prosperity of the Territory.

In this connection, we desire to call attention to a late decision of the supreme court of the State of Nevada, as to the application of the common law to the waters of that State, and it is believed that this decision, and the principles and reasons thereof, are peculiarly applicable to this Territory. We refer to the case of *Vansickle* v. *Haines*, before cited. In that case the court say, in speaking of the applicability of the common law to running streams in the irrigating regions of that State: "It (the common law) is a rule which gives the greatest right to the greatest number, authorizing each to make a reasonable use of it (the water), providing he does no injury to the others equally entitled to it with himself; whilst the rule of prior appropriation here advocated would authorize the first person who might choose to make use of or divert a stream to use or even to waste the whole, to the utter ruin of others who might wish it. The common law does not, as seems to be claimed, deprive all of the right to use, but, on the contrary, allows all riparian proprietors to use it in any manner not incompatible with the rights of others. When it is said that a proprietor has the right to have a stream continue through his land, it is not intended to be said that he has the right to *all* the water, for that would render the stream, which belongs to all the proprietors, of no use to any. What is meant is, that no one can absolutely divert the whole

stream, but must use it in such manner as not to injure those below him. As the right is equal in each owner of the land, because, naturally, each owner can equally enjoy it, so one must exercise that right in himself without disturbing any other above or below in his natural advantages."

The opinion rendered in the case at bar seems to be based upon the proposition, that water for the purposes of irrigation could not be taken from a stream, under the rules and regulations of the common law. We believe this is a mistaken notion. In the case of *Elliott* v. *The Fitchburg Railroad Company*, 10 Cush. 193, Chief Justice SHAW says: " The right of flowing water is now well settled to be a right incident to property in law ; it is a right *publici juris*, of such character, that whilst it is common and equal to all through whose land it runs, and no one can obstruct or divert it, yet, as one of the beneficial gifts of Providence, each proprietor has a right to a just and reasonable use of it as it passes through his land, and so long as it is not wholly obstructed or diverted, or no larger appropriation of the water running through it is made than a just and reasonable use, it cannot be said to be wrongful or injurious to a proprietor lower down. What is such just and reasonable use may often be a difficult question, depending on various circumstances. * * * It has sometimes been made a question whether a riparian proprietor can divert water from a running stream for purposes of irrigation. * * That a portion of the water of a stream may be used for the purposes of irrigating land, we think, is well established as one of the rights of the proprietors of the soil along or through which it passes. Yet a proprietor cannot, under color of that right, or for the actual purpose of irrigating his own land, wholly obstruct or divert the water-course, or take such an unreasonable quantity of water, or make such an unreasonable use of it, as to deprive other proprietors of the substantial benefits which they might derive from it if not diverted or used unreasonably."

The foregoing principles are declared in many decisions, and we are therefore led to believe that at common law,

water for the purposes of irrigation, under the foregoing restrictions and limitations, can be taken from a stream and used to irrigate the lands through which such stream passes.

The decisions in California, which are relied upon to establish the doctrine of prior appropriation, are entirely inapplicable to this case, for those decisions were made in cases where the government yet owned the title to the land, and this fact was the controlling feature in the cases. In the case of *Irwin* v. *Phillips*, the court says: " It is insisted by the appellants that in this case the common-law doctrine must be invoked which prescribes that a water-course must be allowed to flow in its natural channel. But upon an examination of the authorities which support that doctrine, it will be found to rest upon the fact of the individual rights of landed proprietors upon the stream, the principle being, both at the civil and common law, that the owner of lands on the banks of a stream owns to the middle of the stream, and has the right by virtue of his ownership to use the water in its pure and natural condition. In this case, the lands are the property either of the State or of the United States, and it is not necessary to decide to which they belong for the purposes of this case," and the court shows that because the parties were not the *owners* of the soil the common-law rule did not apply. In the case of *Crandall* v. *Woods*, 8 Cal. 141, Justice MURRAY says: "Having thus stated the fundamental principles upon which this right is founded, it is evident that the only difficulty in the case arises : first, from the fact that the defendant is not the owner of the fee of the land, but that title to it is in the government of the United States." And the whole decision turned upon the fact that the title still remained in the government.

In the case at bar, the government has parted with its title, and the plaintiffs and defendants are the owners in fee of their respective parcels of land, and this fact controls the case and brings it within the common-law rule, as to the rights of the owners of lands along the banks of a stream.

The appellants in their argument invite us to look at the consequences to the public and to the Territory at large, if the strange decision of the court below is affirmed. We do not admire the practice of going outside the case to find arguments in support of a desired decision, and such arguments can have no weight here, for every citizen is entitled to his rights, as the law defines them, no matter what the consequences may be; and in such a case as this, and in no other case, can a citizen or a class of citizens be robbed of his or their rights, or of their property, in order to secure to the Territory an imaginary prosperity. But since this invitation has been given, and we are asked to go outside the case and look at the consequences of our decision, we will for one moment do so.

It is well known to any individual who has resided in this Territory for one season, that there is not sufficient available water in the Territory for the purposes of irrigation, and if the doctrine of prior appropriation, as contended for by appellants, is to prevail, long before one-tenth part of the tillable land in the Territory is subjected to cultivation the entire available water of the country will have been monopolized and owned by a few individuals, thereby defeating any advance in the agricultural prosperity of the country, and thereby directly repelling immigration thither. Even now, with a very sparse population, the contentions over water for the purposes of irrigation, and a monopoly thereof, furnish a fruitful source of litigation. And, in the future, when the scant supply of water shall have been all appropriated and owned by a few individuals, and our valleys shall have been drained of all their waters for the benefit of a few men, what is to become of the school lands of the Territory? By the munificent donation of the general government, sections 16 and 36 in every township in the Territory, making thousands upon thousands of acres in the aggregate, are reserved and set apart for school purposes. Here is laid the foundation for a fund that will be ample and sufficient for all time to come, to insure to every child of our Territory or State a thorough education. But if the school lands

can be drained of every drop of water, and if the water that naturally flows through or upon such lands can become the private property of the individual who happens to locate above or below these school sections, as the doctrine of prior appropriation would clearly authorize and permit, then the school lands of Montana would become of no value whatever. In such case they are not now, and never will be, worth one mill per acre. The doctrine of prior appropriation contended for makes our school lands a desert, and this magnificent donation to our children, and to all their posterity, is an inheritance of sand and sage brush — a barren, worthless desert.

What becomes of the railroad land grant through this Territory? Common fairness would dictate that we should not, by our courts or by the legislature, indirectly defeat vested rights. And if there is one thing more than another that we need to develop the untold resources of this country, it is a railroad. But if we destroy the land grant already given for the purposes of a road, or do what is equivalent thereto, make it worthless, can we hope that a railroad will be built? We might just as well repeal the law, giving any railroad in this Territory land, as to take the waters from such lands? The effect would be precisely the same as in either case, and either would forever cripple the prosperity of the Territory.

What says the government of the United States to the doctrine that renders the public domain of Montana utterly of no value? The doctrine of prior appropriation robs the general government of its property, by making the government lands of no value. And all these consequences, so disastrous in any view, are to be visited upon Montana, that a few individuals may have what does not now, and never did, belong to them.

*Judgment affirmed.*