# WILLEY, ET AL., v. DECKER, ADMINISTRATOR, &c., ET AL.

RESERVED QUESTIONS—WATER AND WATER RIGHTS—PRIOR APPROPRIATION—INTERSTATE STREAMS—PUBLIC WATERS—TERRITORIES, SOVEREIGNTY OVER—VESTED RIGHTS—STATUTES—INJUNCTION—JURISDICTION — VENUE — WRONGFUL DIVERSIONS — CONFLICT BETWEEN APPROPRIATORS IN DIFFERENT STATES—DITCHES—QUIETING TITLE, JURISDICTION—FORMER ADJUDICATION—BOARD OF CONTROL.

1. In reserving questions under the statute for the decision of the Supreme Court, the legal question should be stated upon which the opinion of the court is desired.

2. The doctrine of prior appropriation of water has been established as a rule of imperative necessity, and the outgrowth of the custom of the earlier settlers upon the public lands for the purpose of mining, or rendering the soil available for cultivation.

3. Under the doctrine of prior appropriation, it is not essential to a water right that the appropriator should apply the water upon riparian lands.

4. As to the mere right of appropriation, no obligation is imposed upon a party to divert the water at the nearest possible point to his land, or within any particular district.

5. There is nothing in the underlying principle of prior appropriation that he who is first in time is first in right, nor in the reasons that led to the establishment of the doctrine, which is opposed to the acquirement of a water right for the irrigation of lands in one state, by the diversion of the water in another state from a stream flowing in both states.

6. Under the doctrine of prior appropriation, the waters of natural streams, even in the absence of constitutional or statutory declaration to that effect, are to be regarded as belonging to the public, subject to the right of appropriation.

7. The meaning and effect of the expression that the water of natural streams is the property of the public is that it is the property of the people as a whole. Whatever title is held in and to such water resides in the sovereign as representative of the people.

8. The public ownership of the water of natural streams, under the doctrine of prior appropriation, is subject to the right of appropriation for beneficial uses, and to the full extent of that right.

9. Upon the general principles governing the prior appropriation of water, if not prohibited by statute, the owner of lands in another state is not prevented from diverting at a point in this State the water of a stream flowing in both states, and conducting such water upon his lands for their irrigation, and thereby securing a valid water right.

10. While Wyoming and Montana were each under a territorial form of government the sovereign authority resided in the United States.

11. During the period that Wyoming and Montana each existed under a territorial form of government there was no divided sovereignty over the waters of a stream flowing in both territories, since the primary sovereignty over terri-

tories of the United States resides in the general government.

12. A valid water right was secured by the owner of a tract of land in Montana, for its irrigation, who, together with the respective owners of neighboring Wyoming lands, commenced the construction of a dtich in 1884, completed it in 1885, and thereby in 1886 and each year thereafter diverted the water at a point in Wyoming from a stream having its source in Montana and flowing into Wyoming, and conducted and used his proportion of the water upon his said land in Montana for its irrigation.

13. Accrued water rights may not be destroyed, but may be regulated by subsequent legislation.

14. State laws regulating the distribution of appropriated water cannot operate beyond its borders.

15. The right to appropriate water of natural streams for irrigation existed in Wyoming before the enactment of the statute of 1875 declaring that right.

16. Although the act of 1875 declared that the owner or claimant of any land in Wyoming should be entitled to use the water of a natural stream for irrigating the same, it is not to be construed as excluding other lands, since the statute was merely declaratory of a right already existing, and was not the source or exclusive authority for the right of appropriation.

17. As between parties diverting water from the same stream in this State and using the same for irrigating lands within this State, the District Court has jurisdiction, not only to restrain the unlawful diversion of water by one to the injury of the other, but to determine their relative rights to the use of the water.

18. Where a wrongful diversion of the water of a stream is claimed to another's injury, the wrongful act, if any, occurs where the diversion is made.

19. Where a stream has its source in another state, and flows from that state into this State, the District Court of the proper county, having acquired jurisdiction over the parties, has jurisdiction to enjoin defendants from diverting the waters of such stream at a point in the other state to such an ex-

tent as to deprive plaintiffs whose lands are situated in this State of the water for their irrigation, to which plaintiffs are entitled by priority of appropriation.

20. Where a stream has its source in another state and flows from that state into this State, and plaintiffs have acquired, by priority of appropriation, a water right from said stream for the irrigation of their lands situated in the other state, by means of a ditch situated partly in this State, and which connects with the stream and diverts the water at a point in this State, the District Court of the proper county, having jurisdiction over the parties, has jurisdiction to enjoin defendants from diverting the water of such stream at a point in the other state to such an extent as to deprive plaintiffs of the water appropriated by them.

21. The right of a prior appropriator to have the water flow in the stream to the head of his ditch is an incorporeal hereditament appurtenant to his ditch and coextensive with his right to the ditch itself.

22. Since the right of a prior appropriator includes the right to have the water of the stream flow down to the headgate of his ditch, and an injury occurs to that right if such flow be prevented, where the headgate of plaintiffs' ditch and part of the ditch is located in this State, but the lands irrigated are situated in another state where the same stream flows and has it source, the injury to plaintiffs by the wrongful diversion of the water above the headgate of plaintiffs' ditch, thereby preventing the water from flowing down and into the ditch, occurs within this State, whether such wrongful diversion is made in this or the other state.

23. In such case the court is authorized to consider and determine whether or not the plaintiffs have an appropriation superior to the appropriation of defendants, to the end that the rights of plaintiffs may be protected by injunction as against the alleged wrongful acts of the defendants.

24. The common law rule, that an action based upon an act done in one county to the injury of a party in another county may be brought in either county, is applicable where the act complained of occurs in one state to the injury of property in another state.

25. It is beyond the jurisdiction of the courts of one state to enter a decree quieting the title to lands situated in another state.

26. Former adjudication may be pleaded and shown in defense of an action, but the fact that there has been a former adjudication does not determine the jurisdiction of the court.

27. A former decision adverse to an alleged water right by the State Board of Control, and by the District Court on appeal from the board, will not defeat the jurisdiction of the court in a subsequent action to enjoin a wrongful diversion of water to the injury of such alleged right, though such former decision may be *res judicata* as to the right asserted.

28. The proceedings before the State Board of Control for the adjudication of the priorities of rights to the use of water by appropriation are purely statutory, and the authorized appeal from the board to the District Court is merely a continuation of those proceedings in an appellate tribunal, and hence such an appeal does not involve the general jurisdiction of the court to afford affirmative relief.

[Decided August 3, 1903.]                (73 Pac., 210.)

RESERVED questions from the District Court, Sheridan County, HON. JOSEPH L. STOTTS, Judge.

The case is stated in the opinion.

*Appelget & Mullen,* for the plaintiffs.

The proposition that prior appropriation gives the better right is no longer a controverted question. (Broder v. Water Co., 101 U. S., 274.) Such rights are based upon the Congressional enactments, and are dependent upon them. (Basey v. Gallagher, 87 U. S., 670.) The right to divert water for beneficial purposes was early recognized by the laws of this State. (Compiled Laws 1876, p. 377; Moyer v. Preston, 6 Wyo., 308.) Also in Montana. (Atchison v. Peterson, 87 U. S., 507; Basey v. Gallagher, 87 U. S., 670; Thorp v. Freed, 1 Mont., 652, 665.)

The rights of the respective parties standing upon prior appropriation, the rights of the plaintiffs in the case at bar are superior to the rights of the defendants. The fact that

a portion of the lands irrigated under such prior appropria-
tion are situated in one state, and the remainder in another,
can make no difference, for the law of Congress was of
uniform operation, where such rights were recognized and
acknowledged by the local customs and laws and decisions
of the courts. Whatever may now be the rule in this State
under its constitution and laws, the rights of the plaintiffs
in this controversy became fixed by the act of diversion at
the time under the provisions of the laws of Congress, and
the owners, grantees or successors in rights of those ap-
propriators, acquired such vested rights as must be main-
tained and protected.

We believe the second reserved question submitted should
be answered in the affirmative.

We believe it to be a general rule that an injunction is a
personal remedy. That is, it acts upon the person and not
upon the rem; that, therefore, the jurisdiction of the court
depends, not upon the locus of the thing, but, rather, upon
the physical presence of the person. It is defined by our
statute as being "a command to refrain from a particular
act." (R. S. 1899, Sec. 4038.)

A writ of injunction operates in personam. (Beach
Modern Equity Juris., Sec. 638; High on Injunctions, Sec.
1.) The general jurisdiction of courts of equity rests in
personam and not in rem. (Lindley v. O'Reilly, 1 L. R.
A., 79-82; Hart v. Sansome, 110 U. S., 151; 3 Pomeroy
Eq. Juris., Sec. 1318; Storey's Equity, Secs. 899, 744.)

Courts of equity under this principle have given relief in
a great variety of cases, where the defendant was in the
jurisdiction of the court, although it related to lands situ-
ated in another state. A frequent example is the exercise of
chancery powers by courts to compel the specific perform-
ance of a contract in relation to lands situated in another
state, after having acquired jurisdiction of the person of
those upon whom the obligation rests. (Burnley v. Ste-
venson, 24 O. St., 474; Davis v. Headley, 22 N. J. Eq.,
115; Wilson v. Joseph, 5 West., 681.)

And such courts have jurisdiction upon a bill for the removal of cloud upon title. (Hart v. Sansom, *supra.*) And courts of equity of one state may restrain one of its citizens from maintaining an action against another of its citizens in the courts of another state. (Snook v. Snetzzer, 25 O. St., 516; Wilson v. Joseph, 5 West., 681.)

When a party is within a territory he may justly be subjected to its process and bound personally by the judgment pronounced on such process against him. (Pennoyer v. Neff, 95 U. S., 714; 1 Pomeroy Eq., p. 332.)

And this is true, although the subject matter may be situate in another state and referred to in the decree, and the defendant is to do or refrain from doing certain acts with reference to that property. (3 Pomeroy Eq., Sec. 1318.)

It is true that the court would have no jurisdiction were the property to be affected situated in another state, and by the mere force of its decree to establish a title to lands in that other jurisdiction, for the reason that the situs of the property is fixed and determinable by the laws of the state of its location. (Carpenter v. Strange, 141 U. S., 87.) But that is not the case here, for plaintiffs seek to enjoin the unlawful acts of defendants against property only, and not to establish a title. The facts beyond controversy show the title in the plaintiffs, and we assert that the court has jurisdiction to enjoin the trespass. It is an elementary rule that where jurisdiction of the person of the defendant is obtained by a court of equity, and a state of facts is shown, which forms a ground for compelling a party to refrain from asserting a right or title, or from interfering with the established right of another, that a court of equity has jurisdiction to act, and especially so when the relief prayed for can be obtained through the defendants' personal obedience. (Lindley v. O'Reilly, *supra;* Howell v. Johnson, 89 Fed., 556; Conant v. Deep Creek, &c. (Utah), 66 Pac., 188.)

If water appropriated for purposes of irrigation be a real property right, when does it take this character? Is it at the point of diversion, or is it at the place where it is applied to

the soil? If it becomes such only when applied to the soil, then so far as the Demmons are concerned, they stand in no different position than if their headgate was in the State of Wyoming. In that case, all of the real estate would be within the jurisdiction of the state courts where defendants reside. If, however, the water becomes real property at the point of diversion, then the locus of the rights of the plaintiffs, Willey and Ellison, are in the State of Wyoming. We think, under the facts stated, that from either point of view the District Court of Sheridan County has jurisdiction to restrain the defendants from interfering with the rights of the plaintiffs. We believe we might go still further, and say that the court has jurisdiction of not only the person of the defendants by reason of personal service of its process, but of the subject matter as well, and this without reference to the location of the property.

The District Court of Sheridan County is a court of general jurisdiction, both at law and in equity. The subject matter of an action is considered as being equivalent to cause of action, and means the facts constituting the plaintiffs' cause of action. (Chamboret v. Cagney, 2 Sweeney, 378; Borst v. Corey, 15 N. Y., 505; Lehmair v. Griswold, 40 N. Y. Sup., 100.)

An action is variously defined, but generally said to be "a proceeding in a court of justice for the enforcement or protection of a right, the redress or prevention of a wrong." (Bliss Code Pleading, Sec. 1.)

An action of injunction is for the protection of a right and the prevention of a wrong. "A command to refrain from particular act." · (R. S., Sec. 4038.)

The subject matter of the action here, then, is the prevention of a wrong by a command to refrain from a particular act. The wrongful trespass of the defendants as against the property of the plaintiffs is the act complained of. It cannot be seriously controverted that the District Court, having jurisdiction of the defendants by personal service, has also jurisdiction of the subject matter when

the subject matter is not property, but a wrongful act. Whether the plaintiffs have a good and perfect title is not a matter of inquiry. For if their rights were only founded in peaceable possession the defendants would not have right, without process of law, to oust the plaintiffs of that possession. The defendants forcibly possess themselves of rights which the plaintiffs or their grantors have exercised for years.

There is no attempt to vest title by this action, but, rather, to command the respect of defendants to an existing right.

There is no other remedy than by injunction, and that can be obtained only when defendants can be brought within the jurisdiction of the court by a decree in personam. The process of the courts of Montana cannot reach the defendants beyond its territorial limits. It cannot act upon the rem, the point of diversion, for of itself it is neither a trespass nor a nuisance. There is no contractual relation between the parties plaintiff and defendant, so that neither at law or in equity can the courts of Montana, under the peculiar facts existing in this case, afford any relief. The maxim of the law that there is no wrong without a remedy has no force unless it has an application here. The Wyoming court can enforce personal obedience from the defendants. It can punish the failure to obey by proceedings in contempt. It has jurisdiction to enter a decree and to enforce its terms when entered. The courts of no other state as between the parties have that power.

Independent of the period of time when the waters diverted from a natural stream for the purposes of irrigation takes upon itself the characteristics of real estate, we say that the District Court of Sheridan County, under the facts stated, has jurisdiction to adjudicate the right to water. We do not understand that by adjudication of a court new rights are conferred, but, rather, a judicial confirmation of rights already existing. It means only to try and determine what the right is.

While a court of equity cannot create title, or transfer

one in another state, it may determine the character and extent of an existing title in the other state, to the extent at least of fixing the personal rights and obligations of the citizen defendant and limiting him to the proper exercise of the rights belonging to him, and in so doing restrain him from interfering with the rights so found existing in the non-resident. (Pom. Eq. Juris., 332; Massie v. Watts, 6 Cranch, 158; Story Eq. Juris., Sec. 1291; McGregor v. McGregor, 9 Ia., 65; Lewis v. Darting, 16 How. U. S., 1; Phelps v. McDonald, 99 U. S., 298.)

From the form of the fourth question, it would seem that an adjudication had been had by the board of control, as well as by the District Court of Sheridan County, Wyoming, by which an adverse decision had been entered against the rights of Peoples, the grantor of Willey and Ellison. Such, however, is not the fact, as shown by the statement of facts. The board of control refused to adjudicate the question, as did also the District Court, because of want of jurisdiction. It cannot then be successfully contended that there has been an adjudication. It is a well settled rule that nothing short of adjudication upon the merits will constitute *res adjudicata.*

A dismissal of a cause for want of jurisdiction is not a final judgment. (Walden v. Bedley, 14 Peters, 146; Masterman v. Masterman, 51 Pac., 278; 1 Greenleaf Ev., Secs. 529, 530; Wells Res Adjudicata, 441, 455.)

No brief filed on behalf of defendants.

POTTER, JUSTICE.

This cause was submitted to the District Court sitting within and for the County of Sheridan upon an agreed statement of facts, and thereupon that court ordered certain important and difficult questions arising in the case to be reserved for the decision of this court. With one exception the reserved questions relate to the jurisdiction of the court to award the relief prayed for.

The action is brought to restrain certain of the defendants from diverting the waters of Youngs Creek to the injury of the plaintiffs, who claim a right to the use of the water by prior appropriation. Youngs Creek is a natural stream of water, having its source in the State of Montana and flowing thence in a general southeasterly course into Sheridan County, Wyoming. The right claimed by the plaintiffs is founded upon an appropriation of water for the irrigation of lands through the construction of a ditch commenced in the year 1884, and completed in 1885, and the application of the water for the purpose aforesaid in 1886 and each year thereafter. The plaintiffs are Dennis H. Willey, Samuel Ellison, John W. Boyle, Edward Foss and Henry Verley. The defendants against whom relief is sought are Oscar Obberreich and Edgar, John, Edwin and Nathan Demmon. One of the original defendants, Etta L. Nearpass, disclaims any interest; and another, Charles L. Decker, as administrator of the estate of John D. Adams, deceased, was made a party defendant for the reason, as alleged, that he is united in interest with the plaintiffs, but refuses to join in the prosecution of the suit. He was not served with process and made no appearance.

The lands of the plaintiffs are owned by them in severalty, but the water claimed to have been appropriated for the irrigation thereof is diverted through the same ditch known as the "Gladewater Ditch." That ditch was constructed jointly by John W. Boyle, John D. Adams, William T. Peoples and Lewis Walker. Adams is deceased. Boyle is one of the plaintiffs and Peoples and Walker are the grantors, respectively, of the other plaintiffs. The parties who originally constructed the ditch were the owners of the lands lying under and irrigated therefrom.

The headgate of the ditch was and is located in Sheridan County, in this State, and the water of Youngs Creek is diverted thereby in said county. The lands of Boyle, Foss and Verley are situated in this State, but the lands of the plaintiffs, Willey and Ellison, are situated in the County

of Rosebud, in the State of Montana. The situation of the plaintiffs, then, is as follows: They claim respectively to have a right by prior appropriation to the use of a certain quantity of the water of Youngs Creek diverted in this State and conveyed through a ditch located partly in this State for the irrigation of lands owned by them situated in this State and in the State of Montana, respectively. The following admission is contained in the agreed statement of facts: "That the lands owned by the persons named as the original constructors of the Gladewater ditch were irrigated by water from said ditch in the year 1886 and each year thereafter, as follows: John W. Boyle, 78 acres; Edward Foss and Henry Verley, 98 acres; John D. Adams, 120 acres, all in Sheridan County, Wyoming, and William T. Peoples, the lands now owned by Willey and Ellison, situated in Rosebud County, Montana, 160 acres." It should be added that it is admitted that Willey and Ellison reside upon their respective tracts of land in Montana.

In 1897 the defendant, Obberreich, constructed a dam and reservoir in the South Fork of Youngs Creek, and tributary to the same, in the State of Wyoming, for the purpose of catching the flood waters of said tribuary in times of freshets, and conveyed said water upon his lands in said Sheridan County, Wyoming, for the purpose of irrigating the same, and has continued so to do. The said dam and reservoir, it is admitted, are situated above the headgate of the Gladewater ditch, and during the irrigating season said Obberreich diverts all the water flowing in said South Fork above his dam and headgate.

In 1898 the defendants, Edgar, John, Edwin and Nathan Demmon, began the construction of a ditch taken out of the main channel of Youngs Creek, with dam and headgate situated in Rosebud County, in the State of Montana, and above the mouth of the South Fork of said stream and above the headgate of the Gladewater ditch, and diverted a portion of the water flowing in the main channel of said stream, the point of diversion being in Montana, and used

the same in irrigating lands owned by them in Sheridan
County, in this State; and it is admitted that said de-
fendants had continued such diversion and use until the
commencement of the suit, claiming a right adverse to the
rights of the owners of the Gladewater ditch.

It is agreed that in the spring months in certain seasons
there is sufficient water in the stream to supply all the
water rights thereon, but that during the months of June,
July and August water naturally flowing in said stream
at the head of the Gladewater ditch is insufficient to supply
all the parties claiming the right to use the waters of said
stream through said ditch, after the diversions made by the
defendants aforesaid in the States of Wyoming and Mon-
tana.

The summons issued in the action was served upon the
defendant, Obberreich, and upon the defendants, Edgar,
John, Edwin and Nathan Demmon, in Sheridan County,
in this State; but whether they are residents of that county
or not does not appear. It is agreed, however, that they
own lands in the county, and that their diversion of the
water is for the purpose of irrigating those lands. They
each appeared in the cause and answered.

The reserved questions are as follows:

"1. Has the District Court of Sheridan County, Wyo-
ming, under the facts stated, jurisdiction to render a de-
cree restraining the defendants, or either of them, from
diverting the waters of said Youngs Creek to such an ex-
tent as to deprive the plaintiffs, or either of them, of the
necessary water for the irrigation of their said lands?

2. Under the facts stated, are the rights of the plain-
tiffs to the diversion and use of the waters of said Youngs
Creek for the irrigation of their said lands superior to the
rights of the defendants, or either of them?

3. Has the District Court of Sheridan County, Wyo-
ming, jurisdiction to adjudicate the right to water diverted
from a natural stream in said county, in Wyoming, to be
conveyed through the Gladewater ditch and used in the

State of Montana, on the lands of plaintiffs, Willey and Ellison?

4. Has the District Court of Sheridan County, Wyoming, jurisdiction to adjudicate the water right claimed by Peoples and his grantees, Willey and Ellison, under the facts agreed upon herein, after a decision by the board of control and by the District Court of said county adverse to said water right, as hereinbefore stated?

5. Has the District Court of Sheridan County, Wyoming, any jurisdiction under the facts stated to prevent the diversion of water from said Youngs Creek in Montana, and to prevent its being conveyed by private ditch from said State of Montana into the State of Wyoming, and its use in said last named State on lands of the de-defendants Demmons?"

The questions reserved for decision are not happily stated. Some of them seem to comprehend questions of fact, as well as of law. The ultimate question or questions to be determined by the trial court upon a consideration of the facts are set forth rather than the precise legal question or proposition involved in such determination. A more satisfactory method in this class of cases is the statement of the legal question upon which the opinion of this court is desired. In cases coming here under the statute authorizing the reservation of important and difficult questions we have uniformly declined to decide questions of fact, or to pass upon the cases themselves; holding those matters not to be within the contemplation of the statute. In such cases we inspect the record to ascertain whether the questions presented are actually involved in a determination of the matter before the court, but generally for no other purpose. To avoid any possible misunderstanding of the scope and effect of our decision in the case at bar, we propose to consider only the questions of law that appear to be suggested by the reserved questions, rather than decide the questions in the precise form in which they have been prepared. As it is not difficult to gather from the re-

served questions the legal propositions involved, which must have been in the mind of the court in sending the matter here, we are not inclined to apply a technical rule for the purpose of avoiding a decision at this time.

Practically, there are but three legal questions involved. The principal or fundamental question is concealed rather than expressed in the reserved question No. 2. That question is whether William T. Peoples, the grantor of the plaintiffs, Willey and Ellison, acquired a legal right by prior appropriation to the use of the waters of the stream in controversy by joining with the owners of Wyoming lands in the construction of the Gladewater ditch and thereby diverting the waters of said stream at a point within this State for the irrigation of his lands situated in Montana.

As there can be no doubt of the right of the owners of said ditch, who were also proprietors of lands in this State, to make a lawful appropriation, and as it is conceded that they are prior in point of time, and have continued the application of the water to the purpose for which it was originally appropriated, it is not conceived that the trial court regarded a determination of their rights to be involved in much difficulty. We believe, therefore, the question above stated to be the important and difficult legal question intended for our decision.

It is greatly to be regretted that in the determination of a question of such manifest gravity the court has not been favored with a brief or argument on behalf of the defendants. It is a question of the greatest importance, affecting not only private interests, but the public interest as well. Although the right to make an appropriation of the waters of a natural stream by diverting the same in one state or territory and conveying it into an adjoining state or territory for the irrigation of lands there situated, has attracted the attention of those interested in the various irrigation problems that confront the people in the arid portion of this country, and the difficulties liable to arise on ac-

count of the appropriation of water on interstate streams
have been to some extent recognized, there has been no
decision of a court of last resort, so far as we are advised,
upon the particular questions now before us. The question
was presented to the Supreme Court of Colorado, in the
case of Lamson v. Vailes, 27 Colo., 201; but as the cause
could be determined upon another proposition, this ques-
tion was not decided. It was there stated that the case
was one of first impression in that jurisdiction. We are
not called upon in the case at bar to decide whether such
an appropriation as the plaintiffs, Willey and Ellison, rely
on can be lawfully made in this State under our constitu-
tion and present statutes; and we shall express no opinion
on that matter. The appropriation under consideration
was made prior to the admission of Wyoming as a state,
and, indeed, prior to the statute of 1886 covering the sub-
ject of irrigation. Neither is it necessary for us to decide
whether a right by prior appropriation can or could have
been lawfully acquired for the irrigation of lands in an-
other state through the diversion of the water of a stream
lying wholly within the boundaries of Wyoming. The
stream in controversy is an interstate stream. Its source
is in Montana and it flows from that state into Wyoming.
While not expressly stated in the facts of this case, we
think it proper and reasonable to assume that the tributary
from which the diversion of the defendant, Obberreich, is
made has its source in Montana, the same as the main chan-
nel. The contrary is not shown; and as the dam of said
defendant is evidently located close to the Montana line,
we shall, for the purposes of this opinion, consider such
tributary as flowing in both states.

The nearest approach to a decision touching this question
is to be found in the case of Perkins County v. Graff, 114
Fed., 441. That was a case in the U. S. Circuit Court of Ap-
peals for the Eighth Circuit, on appeal from the U. S.
Circuit Court for the District of Nebraska. It involved
the legality of the issuance of certain bonds by Perkins

County, Nebraska, to aid in the construction of an irrigating canal. The proposition of the irrigation company was to construct a canal which should divert the waters of the Platte River at a point in the State of Colorado about eight miles west of Julesburg, and conduct them thence easterly into and through the County of Perkins, in Nebraska. Suit was brought upon certain coupons cut from the bonds; and it was contended, among other things on behalf of the county in attempting to defeat recovery, that the bonds were void on the ground that they were issued to assist the irrigation company in violating the constitution and laws of Colorado, and the comity between the states. The constitution of Colorado declares the water of every natural stream to be the property of the public, and that the same is dedicated to the use of the people of the state, subject to appropriation "as hereinafter provided." It also declares that "the right to divert unappropriated water of any natural stream for beneficial uses shall never be denied. Priority of appropriation shall give the better right as between those using water for the same purpose."

In the case cited, one paragraph of the syllabus as prepared by the court reads as follows: "Drawing water through a canal from one state into another for the purpose of irrigating lands in the latter state is not necessarily a violation of the constitution, laws or policy of the former state, although that state reserves all the waters for itself and its citizens, so far as they are necessary for the beneficial uses to which the state and its citizens apply them." And in the opinion delivered by Circuit Judge Sanborn it is said: "But the constitution, the statutes, and the judicial decisions of Colorado limited the power of its citizens to use the waters of the rivers of that state to the amounts which are necessary for the beneficial uses to which they apply or intend to apply them. The constitution and laws of that state have been in force for many years, and yet there is a surplus of the waters of the Platte River, which flows from the State of Colorado into the

State of Nebraska. No reason is perceived why the irrigation company might not lawfully withdraw this surplus water from the river at such place in the State of Colorado as it should select, and lead it through a portion of that state into the county which issued these bonds, to irrigate the arid lands in that region. Corporations of other states are not prohibited from transacting business in the State of Colorado. There is no law of that state to which our attention has been called which prohibits such corporations from obtaining by purchase the right of way through private property, and no reason is perceived why the scheme of the irrigation company was not both rational and lawful. The construction and maintenance of canals for the purpose of irrigating arid lands is both permitted and promoted by the legislation and the public policy of the State of Colorado. It was undoubtedly a part of the scheme of this company to irrigate the lands in the State of Colorado which should be adjacent to its canal. When this had been done, no injury could result to the state or to the citizens of the State of Colorado from leading the surplus waters of the Platte River through the canal beyond the limits of that state into the County of Perkins, because these surplus waters would flow beyond the borders of that state, and into the State of Nebraska, along the natural channel of the river, if they were not drawn into it through the canal. When the proposition of the irrigation company is carefully and rationally considered, it is not obnoxious to the constitution, the laws or the public policy of the State of Colorado, and these bonds cannot be defeated because the intention of the company was to draw the waters to irrigate the lands of this county from without the State of Nebraska."

The case did not involve a controversy between different appropriators, and is perhaps not to be regarded as a direct precedent upon the question we are now considering. But it is fairly evident, we think, that the learned court perceived no reason why an appropriation of water might not

be made for the irrigation of lands in one state by means of the diversion of water from a stream in another state naturally flowing from the latter state into the former.

In both this State and the State of Montana, through which Youngs Creek flows, the doctrine of prior appropriation is recognized and applied. The adoption of the doctrine by the State of Montana, however, as indicated by the decisions of its courts, has not proceeded upon precisely the same theory, nor have the courts of that state gone to the extent that we have in abrogating the common law rule of riparian rights in respect to the use of flowing water. In that state the doctrine more generally known perhaps as the California doctrine prevails. Stated briefly, that doctrine is that while a stream is situated on the public lands of the United States, a person may, under the customs and laws of a state, and the legislation of Congress, acquire by prior appropriation the right to use the waters thereof for mining, agricultural and other beneficial purposes, and to construct and maintain ditches and reservoirs over and upon the public land, such right being good against all other private persons, and by statute good as against the United States and its subsequent grantees; but that, when a grantee of the United States obtains title to a tract of the public land bordering on a stream, the waters of which have not been hitherto appropriated, his patent is not subject to any possible appropriation subsequently made by another party without his consent. In other words, it is held under that doctrine that the rules of prior appropriation, founded upon local customs and laws, and ratified by congressional legislation, are confined in their operation to the public domain of the United States. (Black's Pomeroy on Water Rights, 44.) In Montana it seems one may make a valid appropriation of water with the same effect on unsold state lands. (Smith v. Denniff, 60 Pac., 398.) It is held in that state that the absolute title to a water right can only be acquired by grant, express or implied, of the riparian owner of the land and water, and the common

law rule that assured to a riparian owner the right to the reasonable use without substantial diminution in quantity and quality of the water flowing by or over his land is abrogated to the extent only that under the doctrine of prior appropriation a riparian owner, or one having title to a water right by grant from him, is allowed to use the water in a manner that at common law would be deemed unreasonable.    (Smith v. Denniff, *supra*.)

Upon that theory the right acquired by prior appropriation on the public domain is held to be founded in grant from the United States Government, as owner of the land and water, under the acts of Congress of 1866 and 1870. (U. S. Rev. Stat., Secs. 2339, 2340.)

In this State, on the other hand, the common law doctrine concerning the rights of a riparian owner in the water of a natural stream has been held to be unsuited to our conditions; and this court has declared that the rule never obtained in this jurisdiction.    (Moyer v. Preston, 6 Wyo., 308.)    It was said in the opinion in that case that "a different prnciple better adapted to the material condition of this region has been recognized.    That principle, briefly stated, is that the right to the use of water for beneficial purposes depends upon a prior appropriation."    And, further, in explanation of the reasons for the existence of the new doctrine, it was said:    "It is the natural outgrowth of the conditions existing in this region of country.    The climate is dry, the soil is arid and largely unproductive in the absence of irrigation, but when water is applied by that means it becomes capable of successful cultivation.    The benefits accruing to land upon the banks of a stream without any physical application of the water are few; and while the land contiguous to water, and so favorably located as to naturally derive any sort of advantage therefrom, is comparatively small in area, the remainder, which comprises by far the greater proportion of our land otherwise susceptible of cultivation, must forever remain in their wild and unproductive condition unless they are re-

claimed by irrigation. Irrigation and such reclamation cannot be accomplished with any degree of success or permanency without the right to divert and appropriate water of natural streams for that purpose and a security accorded to that right. Thus, the imperative and growing necessities of our conditions in this respect alone, to say nothing of the other beneficial uses, also important, has compelled the recognition rather than the adoption of the law of prior appropriation."

In view of the contention in Colorado that until 1876 the common law principles of riparian proprietorship prevailed in that state, and that the doctrine of priority of right to water by priority of appropriation was first recognized and adopted in the constitution, the Supreme Court of that state, by Mr. Justice Helm, concluded a discussion of the matter as follows: "We conclude, then, that the common law doctrine giving the riparian owner a right to the flow of water in its natural channel upon and over his lands, even though he makes no beneficial use thereof, is inapplicable to Colorado. Imperative necessity, unknown to the countries which gave it birth, compels the recognition of another doctrine in conflict therewith. And we hold that, in the absence of express statutes to the contrary, the first appropriator of water from a natural stream for a beneficial purpose has, with the qualifications contained in the constitution, a prior right thereto, to the extent of such appropriation." And it was further said that the latter doctrine has existed from the earliest appropriations of water within the boundaries of the state. (Coffin v. Left Hand Ditch Co., 6 Colo., 443.)

When the question was first considered in the State of Nevada the court held that the patentee of the Government succeeded to all of its rights, and among these was the right to have the water of a stream theretofore diverted returned to its natural channel. (Vansickle v. Haines, 7 Nev., 249.) But that case was overruled in Jones v. Adams, 19 Nev., 78. And in Reno. Smelting, M. & R. Works v.

Stephenson, 20 Nev., 269 (21 Pac., 317), it was unequivocally declared that the common law doctrine of riparian rights was unsuited to the condition of that state. The court said: "Here the soil is arid and unfit for cultivation unless irrigated by the waters of running streams. The general surface of the state is table land, traversed by parallel mountain ranges. The great plains of the state afford natural advantages for conducting water, and lands otherwise waste and valueless become productive by artificial irrigation. The condition of the country, and the necessities of the situation, impelled settlers upon the public lands to resort to the diversion and use of waters. This fact of itself is a striking illustration, and conclusive evidence of the inapplicability of the common law rule."

The leading case in Arizona is Clough v. Wing, 17 Pac., 453. In that case it is said that the problem to be solved in the arid portions of the earth has not been how best to drain the water off the land and get rid of it, but how to save it to be conducted upon land in aid of the husbandman. The learned judge who wrote the opinion refers to the antiquity of irrigation in that section of country and in other lands, and remarks: "Thus we see that this is the oldest method of skilled husbandry, and probably a large number of the human race have ever depended upon artificial irrigation for their food products. The riparian rights of the common law could not exist under such systems; and a higher antiquity, a better reason, and more beneficent results have flowed from the doctrine that all right in water in non-navigable streams must be subservient to its use in tilling the soil." And, further, it is said that the common law, so far as the same applies to the uses of water, "has never been, and is not now, suited to conditions that exist here."

The Supreme Court of Utah say: "Riparian rights have never been recognized in this territory, or in any state or territory where irrigation is necessary; for the appropriation of water for the purpose of irrigation is entirely and

unavoidably in conflict with the common-law doctrine of riparian proprietorship. If that had been recognized and applied in this territory it would still be a desert; for a man owning ten acres of land on a stream of water capable of irrigating a thousand acres of land or more, near its mouth, could prevent the settlement of all the land above him. For at common law the riparian proprietor is entitled to have the water flow in quantity and quality past his land as it was wont to do when he acquired title thereto, and this right is utterly irreconcilable with the use of water for irrigation. The Legislature of this territory has always ignored this claim of riparian proprietors, and the practice and usages of the inhabitants have never considered it applicable, and have never regarded it." (Stowell v. Johnson, 7 Utah, 215; 26 Pac., 290.)

In disposing of what the court calls the "phantom of riparian rights," and declaring that the maxim "first in time, first in right," should be the settled law in that jurisdiction, the Supreme Court of Idaho forcibly state the reasons for the new doctrine: "Whether or not it is a beneficent rule, it is the lineal descendant of the law of necessity. When, from among the most energetic and enterprising classes of the East, that enormous tide of emigration poured into the West, this was found an arid land, which could be utilized as an agricultural country, or made valuable for its gold, only by the use of its streams of water. The new inhabitants were without law, but they quickly recognized that each man should not be a law unto himself. Accustomed, as they had been, to obedience to the laws they had helped make, as the settlements increased to such numbers as justified organization, they established their local customs and rules for their government in the use of water and land. They found a new condition of things. The use of water to which they had been accustomed, and the laws concerning it, had no application here. The demand for water they found greater than the supply, as is the unfortunate fact still all over this arid region. Instead of

attempting to divide it among all, thus making it unprofitable to any, or instead of applying the common law riparian doctrine to which they had been accustomed, they disregarded the traditions of the past, and established as the only rule suitable to their situation that of prior appropriation. This did not mean that the first appropriator could take what he pleased, but what he actually needed, and could properly use without waste. Thus was established the local custom, which pervaded the entire West, and became the basis of the laws we have today on that subject." (Drake v. Earhart, 2 Idaho, 716; 23 Pac., 541.)

We have referred to the case of Moyer v. Preston, decided by this court, in which it was held that the common law of riparian proprietorship did not prevail in this State. In the later case of Farm Investment Co. v. Carpenter, 9 Wyo., 110, we said respecting the use of the waters of natural streams, and the right obtained therein by prior appropriation, for the purposes of irrigation: "This use and the doctrine supporting it, is founded upon the necessities growing out of natural conditions, and is absolutely essential to the development of the material resources of the country. Any other rule would offer an effectual obstacle to the settlement and growth of this region, and render the lands incapable of successful cultivation."

It will be observed that the doctrine of prior appropriation is established as a rule of imperative necessity, and the outgrowth of the custom of the earlier settlers upon the public lands for the purpose of mining or rendering the soil available for cultivation. This is further illustrated by the decisions of the Supreme Court of the United States. The doctrine was first recognized by Congress in 1866 by the act of July 26 of that year; the ninth section of said act declaring that: "Wherever, by priority of possession, rights to the use of water for mining, agricultural, manufacturing or other purposes, have vested and accrued, and the same are recognized and acknowledged by the local customs, laws and the decisions of courts, the possessors

and owners of such vested rights shall be maintained and protected in the same; and the right of way for the construction of ditches and canals for the purposes herein specified is acknowledged and confirmed." (U. S. Rev. Stat., Sec. 2339.) And again by the act of July 9, 1870: "All patents granted, or pre-emption or homesteads allowed, shall be subject to any vested and accrued water rights, or rights to ditches and reservoirs used in connection with such water rights, as may have been acquired under or recognized by the preceding section." (U. S. Rev. Stat., Sec. 2340.)

The acquirement of water rights upon public lands under the custom and rule of prior appropriation was considered by the Supreme Court in Atchison v. Peterson, 20 Wall., 507, and Basey v. Gallagher, id., 670. We quote the expression of the court in the opinion delivered by Mr. Justice Field in the case last above cited: "In the late case of Atchison v. Peterson, we had occasion to consider the respective rights of miners to running waters on the mineral lands of the public domain; and we there held that by the custom which had obtained among miners in the Pacific states and territories, the party who first subjected the water to use, or took the necessary steps for that purpose, was regarded, except as against the Government, as the source of title in all controversies respecting it; that the doctrines of the common law declaratory of the rights of riparian proprietors were inapplicable, or applicable only to a limited extent, to the necessities of miners, and were inadequate to their protection; that the equality of right recognized by that law among all the proprietors upon the same stream would have been incompatible with any extended diversion of water by one proprietor, and its conveyance for mining purposes to points from which it could not be restored to the stream; that the Government, by its silent acquiescence, had assented to and encouraged the occupation of the public lands for mining; and that he who first connected his labor with property thus situated

and open to general exploration, did in natural justice acquire a better right to its use and enjoyment than others who had not given such labor; that the miners on the public lands throughout the Pacific states and territories, by their customs, usages and regulations, had recognized the inherent justice of this principle, and the principle itself was at an early period recognized by legislation and enforced by the courts .in those states and territories, and was finally approved by the legislation of Congress in 1866. The views there expressed and the rulings made are equally applicable to the use of water on the public lands for purposes of irrigation. No distinction is made in those states and territories by the custom of miners and settlers, or by the courts, in the rights of the first appropriator from the use made of the water, if the use be a beneficial one." And again adverting to the act of 1866: "It is very evident that Congress intended, although the language used is not happy, to recognize as valid the customary law with respect to the use of water which had grown up among the occupants of the public land under the peculiar necessities of their condition; and that law may be shown by evidence of the local customs, or by the legislation of the state or territory, or the decisions of the courts. The union of the three conditions in any particular case is not essential to the perfection of the right by priority; and in case of conflict. between a local custom and a statutory regulation, the latter, as of superior authority, must necessarily control."

In Brodie v. Water Co., 101 U. S., 274, the opinion was expressed that the statute alluded to was rather a voluntary recognition by Congress of pre-existing rights, constituting valid claims to a continued use, than the establishment of new rights; and in U. S. v. Rio Grande Irr. Co., 174 U. S., 690, Mr. Justice Brewer, delivering the opinion of the court, observed that "as to every stream within its dominion a state may change this common law rule and permit the appropriation of the flowing waters for such purposes as it deems wise." "Notwithstanding the unquestioned

rule of the common law in reference to the right of a lower riparian proprietor to insist upon the continuous flow of the stream as it was, and, although there has been in all the Western states an adoption or recognition of the common law, it was early developed in their history that the mining industry in certain states, the reclamation of arid lands in others, compelled a departure from the common law rule, and justified an appropriation of · flowing waters both for mining purposes and for the reclamation of arid lands, and there has come to be recognized in those states, by custom and by state legislation, a different rule— a rule which permits, under certain circumstances, the appropriation of the waters of a flowing stream for other than domestic purposes."

We have alluded to the fact that, contrary to the rule established in this and some other jurisdictions similarly situated and subject to the same natural condition, the rights as at common law of individual riparian owners are recognized and applied where such rights have been acquired anterior to an appropriation in conflict therewith. This is the case in the State of Montana in common with several other states, in most of which states, however, the condition exists that the climate is partly humid, and the arid lands are limited to certain localities. The rule in those states where the doctrine of prior appropriation and the common law rule as to riparian rights to the use of water are both enforced is set forth in the able opinion of Judge Holcomb in the case of Crawford County v. Hathaway, decided by the Supreme Court of Nebraska. (93 N. W., 781.) It is there said: "The two doctrines stand side by side. They do not necessarily overthrow each other, but one supplements the other. The riparian owner acquires title to his usufructuary interest in the water when he appropriates the land to which it is an incident, and when the right is once vested it cannot be devested except by some established rule of law. The appropriator acquires title by appropriation and application to some beneficial use, and of which he

cannot be deprived except in some of the modes prescribed by law. The time when either right accrues must determine the superiority of title as between conflicting claimants." It seems that the Legislature of the State of Nebraska had in 1889 abrogated the common law rule of riparian ownership in water, and substituted therefor the doctrine of prior appropriation; but it was held in the case cited that the act could not and did not have the effect of abolishing riparian rights which had already accrued, but only of preventing the acquisition of such rights in the future.

It is no part of our purpose to enter into a discussion in this opinion of the relative merits of the opposing legal theories under which the doctrine of priority of appropriation is maintained and enforced in the different jurisdictions. The stream from whch the appropriations in controversy in this case were made is an interstate stream. In the State of Montana, where the stream has its source, there is recognition of the common law rule as to the rights of a riparian owner, modified, however, as already indicated, by existing conditions and statutes. But in the case at bar there is no disclosure in the statement of facts of any conflict with the claims of riparian owners in Montana. The fact is mentioned that the defendants are owners of lands along the banks of Youngs Creek; but we understand from the other stipulations that those lands are located in this State; and under the decisions of this court, such fact alone confers upon them no title to, or right to the use of the waters of the stream. In the absence of riparian ownership in parties other than the general government or the state, the right of prior appropriation is recognized in the State of Montana.

Our purpose in referring to the various decisions of the courts has been to show the fundamental principle and underlying reasons for the doctrine of prior appropriation. It is to be observed that whether adopted in lieu of or as a substitute for the common law, or merely as a modification

thereof, it is the result of the same conditions, and rests upon the same practical basis.

In the Nebraska case above cited the court say: "This right has grown out of the necessities of the case, and has been sanctioned by the acts of Congress, and recognized by the laws of the state. It is a matter of common knowledge, historical in character, that in the development of the state in the higher altitudes in the western portions, because of the arid or semi-arid climatic conditions which prevail, it has been found impossible to successfully engage in agricultural pursuits, save by applying to the soil, by the process known as irrigation, waters diverted and drawn from natural streams, thereby rendering highly productive a land otherwise valuable only for grazing. It is a fact so common and notorious that we may properly take judicial notice of it, that since the early settlement of the western portions of the state it has been the custom of the settlers to appropriate the waters of the streams flowing therein by means of irrigating canals, and apply them to the soil in prosecuting the business of agriculture in all its varied branches." And the court proceeds to say that such custom existed before the enactment of any irrigation statute; and that where the custom has been so generally recognized as to have the force of law, "it can only be regarded as a substantial adoption of the doctrine of prior appropriation of water which obtains in the arid states immediately west of us."

In the early Montana case of Thorp v. Freed, 1 Mont., 651, the legal ground for sustaining the right to divert and thereby appropriate waters upon the public lands, seems to have been held by Judge Knowles to be that the unsurveyed lands of the United States and the water of the streams flowing through the same belong to no one; and that the one who first appropriates any portion thereof of such lands, or the water incident thereto, for a beneficial purpose, would become the owner thereof, until the general government, or some one claiming thereunder, should assert title

to the same. But the occasion for applying such a rule, and discovering some legal ground for the protection of rights thereunder, is recognized as the outgrowth of the necessities and customs of the country. The learned judge says: "If we were called upon to say what were the necessities of this country, in regard to the use of water for the purposes of irrigation, we should reply that there was a demand that water should be used for that purpose, and that the considerations of the general welfare of the country and the principles of natural equity should guaranty to the prior appropriator of water for such use the first right to the use of the same, to the extent of his necessities for domestic purposes, the quenching of the thirst of himself or animals, and for agricultural purposes. We can see no reason why, if the common law is to be changed by the considerations above named, it should not be changed to suit the wants of the country and in accordance with the principles of equity." And, again: "Ever since the settlement of this territory it has been the custom of those who settled themselves upon any portion of the public domain, and devoted any part thereof to the purposes of agriculture, to dig ditches, and turn out the waters of some stream to be used to irrigate the same. This right has been generally recognized by our people. It has been universally conceded that this was a necessity in agricultural pursuits. So universal has been this usage that I do not suppose there has been a parcel of land to the extent of one acre cultivated within the bounds of this territory that has not been irrigated by water diverted from some running stream." Chief Justice Wade, who delivered a concurring opinion, disagreed with his associate respecting the existence of a custom and insisted upon the applicability of the common law to that territory; and as one of the reasons for maintaining the right of the owner of lands along the margin of a stream to its use, said: "Water for the purposes of irrigation in this country is equally necessary as water to sustain life. They are terms implying the same thing. The resources

of the country cannot be developed, and our valleys cannot be reclaimed and become inhabited, unless the waters of the streams can be used in an equitable manner, to cause the earth to bring forth its fruits." And thereupon he observes "that water for irrigation in this country as naturally belongs to the lands through which the stream passes, in certain proportions, as in other countries it belongs to the land to supply the necessities of life."

With all due respect for the opinion of the learned judge, we feel impelled to say that, in our judgment, his premises do not lead to the conclusion reached. We agree with him as to the natural necessity of water for irrigation; but if that necessity is to be confined to the narrow area of the comparatively few legal subdivisions of land bordering the streams, the valleys will ordinarily not be reclaimed, nor the resources of the country developed; and the application of the common law rule will not result in an equitable use of the waters of the streams.

In the cases involving the subject of irrigation heretofore decided by this court reference has been made to the act of 1875 as the first expression of the legislative department regarding it. That act constitutes, it is true, the earliest attempt in this jurisdiction to regulate the subject. But there are other declarations and provisions anterior to that act which tend to illustrate the custom as to the use of water, and its necessity, and the public recognition thereof.

The First Territorial Legislature enacted a law for the development of the mining resources of the territory, and provided in that act for placing and recording notices of claims for ditches and water privileges, and requiring the completion of such ditches within a certain time after filing notice. (L. 1869, Ch. 22, Secs. 15-18.) And in the act passed by the same Legislature for the creation and regulation of corporations, authority was conferred upon any three or more persons to associate for the formation of a company to construct a ditch for the purpose of conveying water to any mines, mills or lands, to be used for mining,

milling or irrigating of lands; and it was provided that any such company should "have the right of way over the line named in the certificate, and shall also have the right to run the water of the stream or streams named in the certificate through their ditch; Provided, that the line proposed shall not interfere with any other ditch whose rights are prior to those acquired under this article, and by virtue of said certificate. Nor shall the water of any stream be directed from its original channel to the detriment of any miners, millmen or others along the line of said stream, who may have a priority of right, and there shall be at all times left sufficient water in said stream for the use of miners and agriculturists who may have a prior right to such water along said stream." It was also provided that such company should furnish water to the class of persons using water in the way named in the certificate, whether miners, millmen or farmers, whenever they should have water in their ditch unsold, at rates to be fixed by the County Commissioners. (L 1869, Ch. 8, Secs. 28-31.) That act was carried into the compilation of 1876, Ch. 34. In 1884 those sections were amended so as to permit a single company to organize for the purpose of constructing several ditches; but otherwise the law was not changed. As so amended, the provisions became incorporated into the revision of 1887, as Sections 532 to 546, inclusive. And without further alteration they continue in force. (R. S. 1899, Secs. 3066-3069.) Under a provision in the statutes of Colorado similar to that above noticed, to the effect that the water of a stream shall not be diverted from its original channel to the detriment of others along the line of the stream, it was held in a case already cited that it was not intended to prohibit the diversion of water to the "detriment" of parties who might settle upon the stream at some future period, and that detriment at the time of diversion could only exist where the water diverted had been previously appropriated and used; although the qualifying words, "who have a priority of right," was not embodied

in the original Colorado statute, but they were inserted by
amendment at the succeeding session of the Legislature.
The court held the amendment to amount to an acknowledg-
ment by the Legislature of a doctrine already existing under
which rights had accrued that were entitled to protection.
(Coffin v. Left Hand Ditch Co., *supra.*)

In 1873 the Third Legislative assembly of the Territory
of Wyoming adopted a memorial to Congress urging the
grant to the several states and territories situated in the arid
region of one-half the arid lands, the same, or the proceeds
thereof, to be devoted to the construction of irrigating canals
and reservoirs, for the reclamation of the arid and waste
lands; and in the preamble it was recited in substance that
the portion of the public domain lying between the 99th
meridian of longitude west from Greenwich and the Pacific
Ocean is arid and generally incapable of cultivation except
by means of irrigation; that such region embraces more
than one-third of the geographical area of the United
States, and comprises the Territories of New Mexico, Ari-
zona, Colorado, Wyoming, Utah, Idaho and Montana, and
the State of Nevada, and large portions of the States of
Oregon, California, Nebraska, Kansas and Texas, and of
the Territories of Washington and Dakota; that the water
supply of its rivers and smaller streams is abundant to re-
claim millions of acres that lie waste and unproductive;
and that the soils of the region named are remarkable for
their productiveness, when subjected to irrigable agricul-
ture; that the present agriculture of such region is con-
fined to the immediate valleys of the water courses where
irrigating canals are of easy construction, and comparatively
inexpensive, and will remain confined to these narrow lim-
its, unless some extensive system of irrigation can be es-
tablished.

This memorial is not only significant from an historical
standpoint, in view of the later acts of Congress, and es-
pecially the recent Congressional legislation in aid of irriga-
tion enterprises, and the conservation of the waters through

the proposed construction of reservoirs, but it demonstrates emphatically the early recognition in this jurisdiction of the necessity of irrigation, and the great benefits to accrue, from the reclamation, not only of the lands lying adjacent to the streams, but those removed therefrom as well. It shows, also, the prevalence here of the custom existing elsewhere in the West, and the recognition of a similarity in conditions of adjacent states and territories.

From our somewhat extended review of the origin of the doctrine of prior appropriation of the waters of natural streams, it is quite clear that neither the custom or necessity that gave birth to the doctrine was confined to riparian lands. With respect to irrigation, the same necessity existed in the case of all lands, whether bordering on a stream or otherwise. Indeed, if there was any difference, the necessity was greater in the case of non-riparian lands. They constituted, and continue to constitute, the far greater body of lands whose cultivation is desirable, and upon the productiveness of which the welfare of the country in a large measure depends. And it is an undoubted fact that from an early date, if not from the very beginning, the custom of the settlers in the diversion of running water for purposes of irrigation disregarded the location of the lands, except in so far as irrigation was at first confined to lands upon which water could be the more easily and inexpensively conducted.

It is hardly necessary, therefore, to cite authority upon the proposition that, under the doctrine of prior appropriation, it is not now and never has been essential to a water right, that the appropriator should apply the water upon land commonly or legally known as riparian. Pomeroy, in his work on water rights, states that the land which the appropriator possesses and on which the water is used, may be at a distance from the stream, and that the very object of his appropriation may be to conduct the water from the stream, through a ditch or canal across intervening public lands, to the tract which he possesses as a mining claim, a farm or

a mill, or even to sell and dispose of the water thus conducted through the canal to other parties, who use it for like purposes on their own "claims" or tracts of land. (Black's Pomeroy on Water Rights, 47.)

The act of Congress of 1866 granting rights of way for ditches over the public lands recognized a custom to conduct water to lands other than those situated on the margin of streams. Mr. Kinney asserts that a valid appropriation may be made for the irrigation of lands, or for any other beneficial use, not situated upon or near the stream. (Kinney on Irr., 156.) And we think this proposition is conceded in every jurisdiction where the doctrine is to any extent enforced.

In the Colorado case of Coffin v. Left Hand Ditch Co., *supra*, the appellee claimed to have appropriated certain water from St. Vrain Creek, through its diversion by means of a ditch which conducted the water to the James Creek, thence along the bed of the same to Left Hand Creek, where it was again diverted by lateral ditches, and used to irrigate lands adjacent to the last named stream. It was contended that such appropriation was unlawful. But the court upheld it, and said: "In the absence of legislation to the contrary, we think that the right to water acquired by priority of appropriation thereof is not in any way dependent upon the *locus* of its application to the beneficial use designed. And the disastrous consequences of an adoption of the rule contended for forbid our giving such a construction to the statutes as will concede the same, if they will properly bear a more reasonable and equitable one. The doctrine of priority of right by priority of appropriation for agriculture is evoked, as we have seen, by the imperative necessity for artificial irrigation of the soil. And it would be an ungenerous and inequitable rule that would deprive one of its benefit simply because he has, by large expenditure of time and money carried the water from one stream over an intervening watershed and cultivated land in the valley of another.

It might be utterly impossible, owing to the topography of the country, to get water upon his farm from the adjacent stream; or, if possible, it might be impracticable on account of the distance from the point where the diversion must take place and the attendant expense; or the quantity of water in such stream might be entirely insufficient to support his wants."

The Supreme Court of the State of Washington say that, "The right of appropriation, as defined by the best authorities, is not controlled by the location of the stream with reference to the premises which are irrigated." (Offield .v. Ish, 21 Wash., 277; 57 Pac., 809. See also Long on Irr., 50; Thomas v. Guirand, 6 Colo., 530; Hammond v. Rose, 11 Colo., 524; 19 Pac., 466; Oppenlander v. Left Hand Ditch Co., 18 Colo., 142; 31 Pac., 854.) The court say in the case last cited: "The appropriator, though he may not own the land on either bank of a running stream, may divert the water therefrom, and carry the same whithersoever necessity may require for beneficial use, without returning it, or any of it, to the natural stream, in any manner."

This being the law under whatever system the right to appropriate water for irrigation is recognized, the natural and logical result of the doctrine would seem to be at least in the case of interstate streams, and in the absence of contrary constitutional or statutory provisions, that the separation of the lands capable of irrigation from such streams by state lines is of no consequence, if we are to consider merely the general principles of the doctrine and the reasons that called it into existence. The same necessity applies to the lands on either side of the line, and the water naturally flows in the channel of the stream in disregard of such line above as well as below it. We are not aware of any rule which restricts as to location the point of diversion in initiating an appropriation, except the probable requirement that it be so located as to render the proposed diversion feasible in view of the intended use, and possibly

that if the proposed point of diversion be situated upon lands of another, the appropriator shall secure a right of way for his ditch or works to be constructed on such lands. So far as the mere right of appropriation is concerned, no obligation is imposed upon a party to divert the water at the nearest possible point to his land, or within' any'.particular district.

Doubtless it would be conceded that in the case of an interstate stream parties in possession of lands in either state would be entitled to appropriate any water of the stream not previously appropriated for the irrigation of their lands· by diverting the water within the state where their lands are situated; and that the grantor of plaintiffs, Willey and Ellison, was entitled to divert from the stream in controversy, at some point in Montana, sufficient unappropriated water for the irrigation of his lands. The Federal Court sitting in Montana recognized a similar right in the case of a Wyoming appropriator from another stream, flowing from· Montana into Wyoming, and held that an invasion of his rights by the diversion of the water in Montana might be enjoined. (Howell v. Johnson, 89 Fed., 556.) In that case the learned judge said: "The idea that there can arise any international water right question in the case of the appropriation of the waters of an innavigable stream cannot be maintained. The right to such waters, after the National Government has disposed of them, must always be a question pertaining to private persons."

Some expressions contained in the opinion in that case in respect to state ownership and control of the waters of innavigable streams have been supposed destructive of an essential principle in the law of irrigation. It is not necessary. that we agree with all the reasons given by the court for the conclusion announced, nor that we assent to all the views expressed in the opinion. We think there can be little question, but that it was rightly held that the plaintiff in the case had secured a right by appropriation

to the waters of the stream, as against a subsequent appropriator in the other state, which might be protected in the courts of such state against injury by acts occurring therein.

We find nothing, therefore, in the fundamental principle of the doctrine of prior appropriation that he who is first in time is first in right, nor in the reasons that led to the establishment of the doctrine, which is opposed to the acquirement of a water right for the irrigation of lands in one state by the diversion of the water at a point in another state from a stream flowing in both states. But in this and other jurisdictions where the common law, in respect to the use of water and the right thereto, is altogether ignored, there has been established, either by judicial decision or statute, or both, as an essential principle, that the water of all natural streams is the property of the public or of the state. In this State the earliest declaration to that effect occurred in the statute of 1886. It was there declared that the water of every natural stream is the property of the public, subject to appropriation as therein provided. (Rev. Stat. 1887, Sec. 1344.) The constitutional declaration is that such water, as well as the water of all springs, lakes or other collections of still waters within the boundaries of the State is the property of the State; that priority of appropriation for beneficial uses shall give the better right; and that no appropriation shall be denied except the same be demanded by the public interests. (Art. 8, Secs. 1, 3.)

This court has stated that the statutory and constitutional declarations seemed rather to declare and confirm a principle already existing than to announce a new one, for the reason that under the rule permitting the acquisition of rights by appropriation the waters become perforce *publici juris*. (Farm. Inv. Co. v. Carpenter, 9 Wyo., 110.) The appropriation in question antedates the act of 1886. But we think the waters of natural streams, even at the time of such appropriation, are to be regarded as

belonging to the public, subject to the right of appropriation.

That principle is not maintained to the same extent in Montana. It is there held that the right to the use of running water follows the ownership of riparian soil; and that a water right can be acquired only by the grant, express or implied, of the owner of such soil. But it is also said that the State has, by necessary implication, assumed to itself the ownership, *sub modo,* of the rivers and streams of the State and "expressly granted the right to appropriate the waters of such streams, which right, if properly exercised in compliance with the requirements of the statutes, vests in the appropriator full legal title to the use of such waters by virtue of the grant made by this State as owner of the water." (Smith v. Denniff, *supra.*)

The obvious meaning and effect of the expression that the water is the property of the public is that it is the property of the people as a whole. Whatever title, therefore, is held in and to such water resides in the sovereign as representative of the people. The public ownership, if any distinction is material, is rather that of sovereign than proprietor. (Farm Inv. Co. v. Carpenter, *supra.*) That ownership, however, is subject to a particular trust or use, specially defined in the statutes and in the constitution. And that trust or use, in the absence of statute, is just as prominently and intrinsically attached to such public ownership. The waters are held subject to appropriation for beneficial uses. And we have endeavored to show that the right of appropriation is not, in the absence of statute at least, restricted locally nor by state lines. The trust is to be considered as co-extensive with the right on which it rests. Upon the general principles governing such appropriation, we perceive no reason, if the same be not prohibited by statute, why the owner of lands in another state may not at a point in this State lawfully divert the water of a stream flowing in both states and conduct such water upon his lands for their irrigation, and thereby se-

cure a valid water right. There is nothing in the essential character of the trust or use for which the waters are held by the public that, in our judgment, prevents the acquirement of a water right on such a stream in that manner, provided the appropriator is able to comply with the statutory provisions regulating and controlling the appropriation and diversion of the public waters.

Moreover, a desirable comity between the states within whose respective dominions the same stream may flow, and a due regard by each for the rights of the residents and land owners in the adjoining state, would seem to require a liberal view of this matter. In an interesting case in Wisconsin, where the question arose whether the state could constitutionally sell the ice formed upon public waters, it was held that where the term "people of the state" is used to designate the beneficiaries of the trust in navigable waters, all the people who may choose to enjoy the same within the state are referred to, whether citizens of the state or persons who came within its territory, for the purpose of enjoying such public rights. (Rossmiller v. State, 114 Wis., 169.)

Whether upon the grounds stated, the views we have expressed are correct or not, there is another consideration which forces us to the same conclusion. When the appropriation was made Montana and Wyoming were each under a territorial form of government. The sovereign authority resided in the United States. (Cooley's Const. Lim., 526.) It is true that as territories they were invested with certain rights of legislation, and subject to the provisions of their organic acts and other laws of Congress exercised a limited sovereignty over the territory within their respective boundaries. But the primary sovereign authority was the general government. There was then fundamentally no divided sovereignty over these waters.

It must be understood that we express no opinion upon the question as affected by the later legislation of this State

on the subject of the appropriation of water. That legislation did not and could not have destroyed rights already accrued; although, as we have previously held, such accrued rights may be regulated by subsequent legislation, and a compliance with such regulations, if not unreasonable, may be required. (Farm Inv. Co. v. Carpenter, *supra*.) It is evident, however, that one irrigating lands in another state must suffer some disadvantages. The state laws regulating the distribution of the waters cannot operate beyond its boundaries; and it is doubtful whether any remedy in case of injury to his rights is open to such an appropriator other than those obtainable through the medium of the courts.

The only statute in force at the time the appropriation was made under which plaintiffs claim having possible effect upon the question under consideration is Section 1 of Chapter 65 of the Compiled Laws of 1876. It provided as follows: "All persons who claim, own or hold a possessory right, or title, to any land or parcel of land, within the boundary of Wyoming Territory, when those claims are on the bank, margin or neighborhood of any stream of water, creek or river, shall be entitled to the use of the water of said stream, creek or river for the purposes of irrigation, and making said claim available, to the full extent of the soil, for agricultural purposes."

Were this statute to be regarded as the source and the exclusive authority for the right of appropriation, the reference alone to lands within the boundaries of Wyoming Territory might be construed as an exclusion of all lands otherwise situated from the benefits of the act. That might possibly also require a construction excluding lands held by fee simple title. The use of the word "claim" or "claims" in various places in the act would seem to indicate that the purpose of the statute was to authorize an appropriation for the irrigation of land held under possessory title. It may have been deemed desirable to dispel any doubts respecting the right to make an appropriation for land so held.

But the right existed before the passage of the act.   The latter is to be considered as declaratory only, and not as the creator of a new right or privilege.   It contains no negative words showing an intention to limit or qualify the right.   Other territories adopted statutes practically in the same language.   Notably, Colorado and Montana; the one situated south and the other north of us.   Doubtless the one first passed furnished an example for the others. We think the intention of the Legislature in mentioning alone lands situated within this territory was not to exclude other lands, any more than the mention of irrigation was intended as an exclusion of other beneficial uses.   It was quite natural without any positive purpose of exclusion to mention Wyoming Territory, since the Legislature was enacting laws for that territory.   It was no doubt understood that a statute would have no extra territorial effect.   It is, of course, true that the plaintiffs who own lands in another state cannot claim by virtue of the statute referred to; but their right depends upon the law that existed independent of the statute.

We have already extended the discussion of this question beyond our original purpose.   But we cannot forbear a brief reference to two public reports of administrative officers as illustrating the practical necessity of the rule laid down.   In the very able report of Mr. Fred Bond, the State Engineer of Wyoming, for the years 1901 and 1902, appropriations of water from interstate streams is considered at some length, and some practical suggestions are made to the end that through uniformity of laws such appropriations may be equitably regulated.   The significant feature of his discussion, in this particular connection, is the necessity of recognition of all appropriations from such streams, whether the diversion occurs in the one state or the other, based upon the only principle that he deems entitled to consideration, viz., the principle that priority of appropriation gives the better right, and that an appropriation consists of two things—a diversion by some adequate means and an application to some beneficial use.

He says: "Upon the doctrine that priority of appropriation gives the better right is based the adjudications of water in all the arid states, yet not one of them has undertaken to carry this doctrine to its logical conclusion. There is no reason why an appropriator from a stream lying wholly within a state should receive protection, either better or different in kind, from that accorded to a user from a stream passing from one state into another, and if much costly litigation in the United States courts is to be avoided, if, in a word, all appropriations are to receive the same protection and in the same degree under state laws as a part of them now enjoy, means for securing that protection must be early devised."

In a report to the Department of Agriculture of the United States, from the Office of the Station for Irrigation Investigations, dated June 15, 1899, is contained a very interesting, as well as instructive, discussion of the water right problems of Bear River, a stream flowing through three arid states, Wyoming, Idaho and Utah. It appears therefrom that there exist several cases upon that one stream where a diversion is made in one state for the irrigation of lands in another. In the case before us two instances of the kind appear. Hence, it would seem that irrigators have not deemed it obligatory upon them under the law to confine their diversion and application to the same state in the case of an interstate stream.

The question next demanding our attention is whether the District Court of Sheridan County, in this State, has jurisdiction, in case the facts warrant it, to decree the relief prayed for. That relief, so far as concerns the inquiry before us, is two-fold. First, an adjudication of the priorities of rights to the use of the waters of Youngs Creek; and, second, the granting of an injunction to restrain the defendants from diverting any of said waters to the injury of the rights of plaintiffs.

The defendants against whom the relief is demanded were served with process, and have appeared and answered.

It does not appear whether they are residents of this State or not. Possibly it might be proper to assume the fact of such residence; but we are inclined to consider the matter immaterial. The court has obtained jurisdiction over their persons, and they have submitted themselves to that jurisdiction by filing an answer to the merits.

It is contended that jurisdiction to prevent the continuance of the alleged injuries exists on the ground that the writ of injunction operates *in personam*. And Mr. High states that the remedy by injunction being primarily *in personam*, a nuisance consisting of an injury to water rights may be enjoined in the state which has jurisdiction of the person committing the injury, regardless of the *locus* of the nuisance itself. (1 High on Inj., 803.) But he cites an early case to the contrary, where it is held that the jurisdiction is *in rem*, and that a nuisance consisting of a diversion of water from a river which is the boundary line between two states must be enjoined in the state where the nuisance is located. (Stillman v. White Rock Man'f'g Co., 3 Woodb. & M., 538.) It is to be observed, however, that the only material question in that case was whether the Federal Court in Rhode Island possessed jurisdiction to restrain a defendant, over whose person the court had jurisdiction, from diverting the water of a stream dividing Connecticut and Rhode Island in the latter state to the injury of plaintiff's mill in the former; and Judge Woodbury stated that if the view he took of the matter was not sound, it might be reasonable to hold a wrongdoer liable, either where the direct act is done or where the consequential injury is felt.

We conceive it unnecessary to place the jurisdiction of the District Court on the sole ground that the writ of injunction operates *in personam*. Indeed, as this case does not involve any contract rights, nor any question of fraud, we think there might exist some doubt of the jurisdiction of the court, based upon that ground alone, where the wrong act and the consequential injury both occurred in

another state or jurisdiction. (See Northern Ind. R. Co. v. M. C. R. Co., 15 How. (U. S.), 233; Livingston v. Jefferson, 1 Brock., 203; Alexander v. Tolleston Club, 110 Ill., 65.)

The diversion by the defendant, Obberreich, occurred and is being continued within this State and in the County of Sheridan; and the lands, as well as ditch of the plaintiffs, Boyle, Foss and Verley, injured by such diversion, are situated in the same county and State. It is clear, therefore, that, whatever the form of action, the District Court of Sheridan County, as between those parties, has ample jurisdiction. It has jurisdiction as between them not only to restrain Obberreich from unlawfully diverting the waters to the injury of the rights of Boyle, Foss and Verley, but to determine their relative rights to the use of the water; the water diverted by Obberreich being used on Wyoming soil.

The diversion made by the other defendants occurs in Montana, and, although they conduct the water so diverted to and upon lands within this State, the act of diversion occasions the injury complained of, and the wrongful act, therefore, if any, occurs in Montana; while it is equally obvious that the *locus* of the injury to plaintiffs, Boyle, Foss and Verley, is in this State, where their ditch and lands are situated.

Under our code provisions, actions for the recovery or partition of real property must be brought in the county where the subject of the action is situate. (R. S., 3496.) Generally, for the recovery of a fine, forfeiture or penalty imposed by statute, the action must be brought in the county where the cause, or some part thereof, arose. (Id., 3499.) No special provision is made respecting actions growing out of nuisance, trespass and the like; and such actions are probably governed, so far as the code is concerned, by Section 3505, which requires every action not otherwise mentioned to be brought in the county where a defendant resides or may be summoned. We are not in-

clined, nor do we believe it necessary, in this case to consider the effect of the code provisions upon this kind of action irrespective of the location of the wrong and injury. It may be conceded, for the purposes of this decision, that the court would not assume jurisdiction unless it were found, in the class of cases referred to, that either the wrongful act or the injury occurred in this State.

At common law, "where the action is founded on two things done in several counties, and both are material and traversable, and the one without the other doth not maintain the action, then, the plaintiff may bring his action in which of the counties he will." In Bulwer's case, 7 Coke, 1, it is laid down: "When matter in one county is depending upon a matter in the other county, there the plaintiff may choose in which county he will bring his action," and: "If a man doth not repair a wall in Essex which he ought to repair, whereby my land in Middlesex is drowned, I may bring my action in Essex, for there is the default; or I may bring it in Middlesex, for there I have the damage." (Rundle v. Delaware & R. Canal, Wallace, Jr., 275; Foot v. Edwards, 3 Blatch, 310; Thayer v. Brooks, 17 O., 489; Barden v. Crocker, 10 Pick., 383; Lower Kings, &c., Ditch Co. v. Kings River & F. Canal Co., 60 Cal., 408; Deseret Irr. Co. v. McIntyre, 52 Pac., 628.)

Applying this principle, it was held in Foot v. Edwards, *supra,* that the Circuit Court of the United States for Connecticut had jurisdiction of an action by the owner of a mill in Massachusetts on a stream flowing into that state from Connecticut against one who diverted in the latter state the water of the stream, so that it ceased to flow to plaintiff's mill. And a similar decision was made in Rundle v. Delaware & Raritan Canal, *supra,* where the canal causing the injury was situated in New Jersey, and the lands injured were in Pennsylvania.

In the California case above cited plaintiff and defendant diverted the water of Kings River, in Fresno County. Plaintiff's ditch was about twenty miles in length, of

which about eighteen miles was in Tulare County, and the damage was sustained by plaintiff in the last named county; in which county the action was brought. The acts complained of being the prevention of water from flowing in plaintiff's ditch, which was located in both counties, while the specific act of diversion complained of occurred in Fresno County, it was held that the subject of the action was in both counties, and the action might have been brought in either.

In the case of Deseret Irr. Co. v. McIntyre, *supra,* the plaintiff's dams and ditches, as well as its lands to be irrigated therefrom, were situated in Millard County, where the action, similar to the one at bar, was brought. The dams and ditches of the defendants were located in Sanpete County. The court observes that neither the facts relating to the diversion alone, nor those relating to the injury alone, are sufficient to constitute a cause of action; that some of the material facts arose in Sanpete County and some in Millard County, and the cause of action may be said to have arisen in each county. And the court say: "Therefore, the plaintiffs had the right to elect in which they would bring their action."

From the authorities referred to, it is evident that the rule is the same where the act complained of occurs in one state to the injury of property in aonther. And upon principle, there is no reason why it should not be so. In a Massachusetts case the action was brought by the owner of a mill in Rhode Island. In discussing the matter, and referring to the common law rule where the *locus* of the wrongful act and injury occur in different counties, Mr. Justice Holmes remarks: "As between two states, both of which recognize the right, if the rule is to vary at all, it should be on the side of greater liberality, to prevent a failure of justice such as would be likely to happen in the present case if this action were not maintained." (Mannville Co. v. Worcester, 138 Mass., 89.)

It was held in New Hampshire that, where the person of

a defendant is within the jurisdiction of the court, he may be enjoined against destroying a dam of the complainants situated out of the state which would result in injury to property in the state. (Great Falls Man'f'g Co. v. Worcester, 23 N. H., 462.) This was a case where the owners of certain cotton mills requiring the water of Salmon River to enable them to use the mills had maintained a dam across the river partly in New Hampshire and partly in Maine. The defendant, a citizen of New Hampshire, had destroyed part of the dam and threatened to remove the whole of it. The question was whether the court had jurisdiction to restrain the defendant from going into the State of Maine and there committing acts injurious to the property of complainants in New Hampshire; and it was held that the court had jurisdiction.

On principle and authority, therefore, we think there can be no doubt of the jurisdiction of the District Court to render a decree restraining the defendants Demmons from diverting the waters of the stream in Montana to such an extent as to deprive those plaintiffs whose lands are situated in this State of the water to which they are found to be entitled by priority of appropriation. As to them, the whole of the injury occurs in this State.

We are of the opinion, also, that jurisdiction resides in the court to restrain said defendants, as well as the defendant Obberreich, from diverting the waters of the stream, as alleged, to such an extent as to deprive the plaintiffs, Willey and Ellison, of the water appropriated by their grantor by means of the ditch in question to which they may be found entitled.

It is true their lands that are irrigated by means of the water appropriated, as claimed, are within the State of Montana; and that the injury to their rights consists partly in the deprivation of said lands of water for their irrigation; and hence that the injury in that respect, as well as the acts of some of the defendants, occurs without this State. But whatever rights by appropriation they have is in con-

sequence of their succeeding to the right of their grantor, Peoples, who was a joint owner of the ditch used to convey the water to such lands. Part of that ditch, how much does not appear, and the headgate thereof, are situated in this State. The waters for the irrigation of the lands aforesaid are diverted in this State. The right of the prior appropriator to have the water flow in the stream to the head of his ditch is an incorporeal hereditament appurtenant to his ditch and co-extensive with his right to the ditch itself. (Kinney on Irr., 247; Lower Kings, &c., Co. v. Kings R. & F. Canal Co., 60 Cal., 408; Deseret Irr. Co. v. McIntyre, 52 Pac., 628; Conant v. Deep Creek, &c., Co., 66 Pac., 188 (Utah); Smith v. Denniff (Mont.), 60 Pac., 398; Wyatt v. Larimer & Weld Irr. Co. (Colo.), 33 Pac., 144.)

In the case last cited Mr. Justice Goddard says: "That a valid appropriation of water from a natural stream constitutes an easement in the stream, and that such easement is an incorporeal hereditament, the appropriation being in perpetuity, cannot well be disputed." He refers to the discussion of property in water by Washburn in his work on Easements and Servitudes (p. 276), and Angell on Water Courses (Sec. 141), and adds: "The right acquired to water by an appropriator under our system is of the same character as that defined by the foregoing authorities as an incorporeal hereditament and easement. The consumer under a ditch possesses a like property. He is an appropriator from the natural stream, through the intermediate agency of the ditch, and has the right to have the quantity of water so appropriated flow in the natural stream, and through the ditch for his use."

In the California case cited, it was said that the consequences of the act of diversion "operated upon the whole of plaintiff's ditch, and was injurious as well to that part of it in Tulare County as to that in Fresno County. In no sense can the injury be said to be confined to that part of the ditch in Fresno County. The ditch is an entirety, and the right to have water flow in it is co-extensive with plaintiff's right to the ditch itself." (60 Cal., 408.)

The rights of plaintiffs, Willey and Ellison, therefore, if they be found entitled by priority of appropriation, upon the facts, to the use of the water as against any appropriation of defendants, includes the right to have the water of the stream flow down to the headgate of the ditch. And an injury occurs to their rights if that flow be prevented. It follows that they suffer an injury within this State through the diversion of defendants at points above the headgate of the Gladewater ditch.

The inquiry presented by the third reserved question is whether the District Court has jurisdiction to adjudicate the right to water diverted from a natural stream in this State to be conveyed and used in the State of Montana on the lands of plaintiffs, Willey and Ellison. It is obvious that in order to protect their rights in and to said water it will be necessary for the court to consider and determine what their rights are as against the defendants; whether or not they have an appropriation superior to the appropriation of the defendants. To that extent no doubt the court has jurisdiction. Having jurisdiction to protect their rights in the stream, the court is clearly authorized to inquire into and determine them. But there is some uncertainty in the question and it may be intended to reach beyond that. It is possible that the question may have been intended to embrace an inquiry into the court's jurisdiction to enter a decree forever quieting the title of the plaintiffs to the water claimed to have been appropriated by them. There might be no reasonable objection to that jurisdiction as between all the parties other than Willey and Ellison, the owners of Montana lands. The lands irrigated by all the other parties are situated in this State, and within the county wherein the court is held. In the possible view stated of the question, it is a perplexing one in respect to Willey and Ellison; and as for all practical purposes their rights can be fully protected by the writ of injunction, we are not inclined to decide it upon this hearing; it not being entirely clear that it presents the inquiry suggested.

An action was commenced in one of the District Courts of Idaho to quiet the title of the plaintiffs to the waters of a certain stream which rises in Idaho and flows into Utah. In that action various parties appeared, some of whom had made appropriations by diverting the water in Utah and irrigating lands in that state. The court entered a decree awarding to each of the parties, the Utah as well as the Idaho appropriators, specific quantities of the waters of the flow of said stream, and quieting their respective titles thereto. Subsequently some of the Utah parties brought suit in that state asking a decree in accordance with and based upon the Idaho decree. The Supreme Court of Utah held that the proceeding in the Idaho court was without jurisdiction as to the appropriations made as aforesaid in Utah. The decision was based upon the ground that a water right for irrigation is appurtenant to the land irrigated, and that an action to quiet title and establish the right to divert and use water for such purpose is in the nature of an action to quiet title to real estate, which must be prosecuted in the courts of the state in which the same is situated. It is to be observed that not only the lands irrigated, but the points of diversion and ditches of the Utah parties were located in that state. The substantial effect of the decision was that the Idaho court was not vested with jurisdiction to determine as between themselves the rights of the several appropriators who diverted water from the stream in Utah, and used the same for irrigating lands in that state, and to quiet their titles thereto. (Conant v. Deep Creek, &c., Co., 66 Pac., 188.)

It was, however, conceded upon the principle that a person who has appropriated water is entitled to have so much of the waters as he has appropriated flow down to the point of his diversion, that if the settlers higher up on the stream, in another state, whose appropriations are subsequent, divert any of the waters of the stream which have been so first appropriated, then the courts of the latter state will protect the first settler in his rights, citing Howell v. Johnson, 89

Fed., 556.   And the court said: "The Idaho courts, there-
fore, have ample and complete jurisdiction to protect the
rights of respondents to have the water which they have
appropriated, and which they divert in Utah, flow through
the channel of the stream, and to limit and determine the
rights of the Idaho proprietors with reference thereto."

The distinction between the facts in that case and the
one here is that there the parties over whose titles the juris-
diction was denied for the purpose mentioned both diverted
and used the water without the territorial jurisdiction of the
court which had entered the decree; while here the diver-
sion is in this State and the use occurs in another.   Yet
to some extent the same reasoning applies.   It would not
be insisted that the courts of this State could entertain
jurisdiction to quiet the title to lands situated in Montana.
They might protect certain rights connected with that title.
Is is held that courts of equity may decree specific perform-
ance of contracts respecting land situated beyond the juris-
diction of the state where the suit is brought.   The ground
thereof being that courts of equity have authority to act
upon the person; and, although they cannot bind the land
itself by their decree, yet they can bind the conscience of
the party in regard to the land, and compel him to per-
form his agreement.   (2 Story's Eq. Jur., Sec. 743.)

If, therefore, a decree adjudicating the various priorities
of the parties would operate as a decree quieting the title
to the lands of plaintiffs, Willey and Ellison, in another
state, it is quite obvious that it would be beyond the juris-
diction of the court.   But for the reasons stated, we shall
decline at this time to go into the matter further.

The fourth reserved question is as follows: "Has the
District Court of Sheridan County, Wyoming, jurisdiction
to adjudicate the water right claimed by Peoples and his
grantees, Willey and Ellison, under the facts agreed upon
herein, after a decision by the board of control and by the
District Court of said county adverse to said water right,
as hereinbefore stated?"

The reference in the question to the agreed facts is not strictly accurate. The decision of the board and the court was not adverse to the right on its merits; but in each forum an adjudication was denied on the ground of want of jurisdiction. It is disclosed by the statement that Peoples submitted to the board of control in 1892 his proof for the adjudication of his water right, and that said claim was rejected by the board, they holding that they had no jurisdiction to adjudicate water for use in the State of Montana; that on an appeal by other parties to the District Court, Peoples attempted to intervene, and his petition therefor was denied by the court for want of jurisdiction. The fact, however, that there has been a former adjudication of any matter does not determine the jurisdiction of the court. Former adjudication may be pleaded and shown in defense. We said in State ex rel. v. Ausherman et al., 72 Pac., 200: "It is not understood that former adjudication is a bar to jurisdiction. It may constitute a good defense to the proceeding upon some issue involved, and control the decision of some question necessary to be determined." This consideration alone requires us to say that an adverse decision by the board of control and the District Court on appeal would not defeat the jurisdiction of the court, any more than such a decision would defeat jurisdiction in any other case.

Proceedings before the board of control are purely statutory. And an appeal to the District Court from a decision of the board is merely a continuation of those proceedings in an appellate tribunal. Such an appeal is based upon the statute, and does not invite the general law and equity jurisdiction of the court to afford affirmative relief. The character of those proceedings was quite fully considered in the case of Farm Inv. Co. v. Carpenter, 9 Wyo., 110.)

Similar statutory proceedings are provided for in Colorado, except that they are prosecuted in the courts in the first instance. It is held in that state that under the stat-

utes governing such special proceeding the court had no
jurisdiction therein to award a priority to a ditch for the
irrigation of lands in, New Mexico.    (Lamson v. Vailes,.
27 Colo., 201.)

But this is not an appeal from the decision rendered in
the statutory proceeding, and such decision is not before
this court for consideration.    Neither is the question .be-
fore the court whether that decision is *res judicata* of the
matter now pending between the plaintiffs, Willey and
Ellison, and the defendants.

We have thus considered all the questions which we un-
derstand to be presented by the record.

A recapitulation of our views with special reference to
the several reserved questions we believe to be unnecessary.

CORN, C. J., and KNIGHT, J., concur.